O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **BARRY GLENN WILLIAMS,** | ) | **Case No. CV 00-10637 DOC** |
| **Petitioner,** | ) | |
| | ) | **DEATH PENALTY CASE** |
| **v.** | ) | **[REDACTED]** |
| **RON DAVIS\*,** | ) | |
| **Warden, California State Prison** | ) | **ORDER GRANTING HABEAS** |
| **at San Quentin,** | ) | **RELIEF  CLAIMS 1(E), 6(B),** |
| **Respondent.** | ) | **11(E) AND 5(C)** |
| _____ __ | ) | |

The Court has conducted an evidentiary hearing regarding the prosecutorial misconduct claims set forth in the Court's December 10, 2013 Order, and has considered the post-hearing briefing submitted by the parties.  Now, the Court issues the following Order.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   **Factual Background**

Following a trial by jury, Petitioner was convicted of the first degree murder of

---

\*    Ron Davis is substituted for his predecessors as Warden of California State Prison at San Quentin, pursuant to Federal Rule of Civil Procedure 25(d).

Jerome Dunn.[1]  The sole special circumstance was that Petitioner had been previously convicted of the June 16, 1981 murder of Donald Billingsley.

The charges against Petitioner originally arose out of two incidents:  the shooting deaths of Billingsley in June 1981, and Dunn in March 1982.  Petitioner was initially charged with Billingsley's murder but the information for that crime was dismissed for insufficiency of the evidence presented at the preliminary hearing.  After the prosecution filed a new complaint charging Petitioner with the Billingsley murder and adding another charge for the Dunn murder, the California Supreme Court ordered that the trial court sever the two murder charges.  Williams v. Superior Court, 36 Cal. 3d 441, 446 (1984).  **A    .**

**Guilt Phase Trial**

Prior to his trial for the Dunn murder, Petitioner was found guilty of one count of first degree murder for the death of Billingsley, as well as two counts of attempted murder and one count of conspiracy to commit murder.  Petitioner was sentenced to 34 years to life in state prison for the Billingsley murder.  Petitioner's trial for the Dunn murder commenced on October 16, 1985.

The principal witnesses against Petitioner were Patricia Lewis, an eyewitness, and Arthur Cox and John Gardner, two jailhouse informants who testified regarding Petitioner's comments to them about the Dunn murder.  At the time of Dunn's murder, Petitioner, also known as "Big Time," was a member of the 89th Street Family Bloods, a street gang in South Central Los Angeles.  Its rival gang was the Crips, especially the Avalon Garden Crips.  Bloods wore red; Crips wore blue.  On the morning of March 25, 1982, Petitioner led a meeting of Bloods in order to "protect" the neighborhood from various Crips and it was stated at the meeting that anyone who wanted to shoot rival gang members could go out and shoot.

On the afternoon of the same day, Marcellus Gray (deceased by the time of trial),

---

[1]    These facts are set forth in the Court's December 10, 2013 Order and the California Supreme Court's  decision on direct appeal, set forth in People v. Williams, 16 Cal. 4th 153, 176-86 (1997).

along with Kathleen Gurley, drove in Gray's blue van to a Food Barn near the corner of Rosecrans and Central. Gurley testified that around 6:30 p.m., Gray came running into the market and recounted that his van had just been stolen from him at gunpoint by two African-American men. Gurley and Gray returned home after reporting the theft to the police.

Shortly after the van was stolen, it was driven towards the intersection of 88th Place and McKinley Avenue. When the van arrived at the intersection, Kenneth Hayes, and the victim, Dunn, were riding on their bicycles. Both Hayes and Dunn associated with the Grape Street Crips gang, and both were dressed in blue clothing, which was typical for Crip gang members.

At that time, Lewis was a passenger in a station wagon driven by Jean Rivers which was stopped at the stop sign on 88th Place. Lewis identified Gray's van as the one she had seen at that intersection, and described seeing two young men riding on their bicycles. When the van began to turn, she looked at the driver, whom she identified as Petitioner. She saw that Petitioner had something shiny in the upper right side of his mouth, because the occupants of the van were laughing. She also testified that as Dunn rode by, the driver of the van said, "Let's go f___ him up," and that they drove to the place where Dunn had stopped on his bicycle and spoke with Dunn. (Later, years after the trial concluded, Petitioner discovered that Lewis's testimony identifying the driver of station wagon as Jean Rivers was false; the true identity of this woman was Arlene McKay.)

As Hayes rode closer on his bicycle, he heard chattering and laughter, and stopped within three or four feet of the driver's door and could see the driver's hands on the wheel. Then, a person's hand and right arm came out of the van driver's window, holding a handgun, with the muzzle four or five inches from Dunn's head. Hayes watched as the shooter fired about four shots at Dunn, who fell from his bicycle after the first shot. Dunn jumped and blood came from his mouth and nose. In all, the shooter fired five .38-caliber bullets into Dunn's head and upper body, killing him.

Lewis testified that, as she watched the van, she leaned over and rolled down the

3

driver's side window because she was "nosey."  Petitioner was wearing a dark jacket and Lewis saw his hand come out through the driver's side window of the van holding a gun. At that point, Rivers drove the station wagon forward and Lewis heard three or four gunshots.  Rivers then drove to Lewis's home on 87th Place.  Prior to entering her home, Lewis saw the van again, and Curtis Thomas (aka Bongo) and Mark Williams were in the van with Petitioner.

Less than an hour later, police recovered Gray's van approximately four blocks from the scene of the shooting.  Hayes identified it as the van from the shooting.

John Gardner testified that, at about 9:00 p.m. on the evening Dunn was shot, he saw Petitioner and Petitioner told him that he had taken a rival Crip member from "out of the box" (gang jargon meaning that Petitioner had killed him).  Gardner testified that Petitioner stated that it was "Silky" he had killed, but muttered under his breath that the victim was actually "Bone" (Dunn's gang name).  Petitioner also discussed the murder again with Gardner a week and a half later.

Cox testified that, while he and Petitioner were in Los Angeles County Jail together, Petitioner told Cox that Blood gang member Thomas (aka Bongo), who was in the van with Petitioner when Dunn was killed, actually shot Dunn, but Petitioner had told him to shoot. Petitioner also told Cox that all of the Crips in the jail were trying to "get" him for killing Bone.

Following his arrest and prior to trial, Petitioner attempted to intimidate Lewis by arranging for a fellow gang member, Mark Williams (no relation to Petitioner and also known as "Snoop Dog") to shoot at Lewis's home while she and her family were inside. This shooting occurred on an evening in January 1983.  Lewis was at home with her husband and grandson, and 45 to 50 shots were discharged into the house.  Lewis, holding the baby, crawled to safety in a back bedroom.  Lewis had never experienced anything similar to this event and feared for her life.  Consequently, she testified falsely at the preliminary hearing that she did not know whose arm had held the gun that was used to shoot Dunn.

4

Kenneth Simmons, a former member of the 89th Street Family Bloods, first testified that he did not remember having a conversation with Mark Williams, but later testified that Williams had told him that Petitioner wanted Williams to scare "the lady on 87th Street who was going to court on him." Specifically, Simmons testified that, on January 7, 1983, Simmons was "getting high" with Williams and Williams told him that he and others had gone to "take care of some business" involving a witness who was testifying against Petitioner, but it "wasn't done right." Simmons testified that Williams told him it was Petitioner who wanted this "business" taken care of and that the witness lived on 87th Street. However, Mark Williams testified and denied shooting at Lewis's house and any conversation with Simmons regarding any shooting. Nevertheless, Williams admitted that he was a member of the 89th Street Family Bloods at the time of the Dunn murder and that he knew Petitioner.

Petitioner's counsel presented an alibi defense that Petitioner was with Jeanette Houston, the mother of his child, on the night of the murder and stayed overnight at the home of Petitioner's aunt, Lena Bridges. Bridges testified that, on that night, she was preparing to go to a cosmetics sales party and Petitioner and Houston stayed together that night in one of the bedrooms of the house. Edward Sanchez, a private defense investigator, testified that Houston told him these facts during an interview in August 1982. However, Houston (née Jeanette Renee King), testified that her relationship with Petitioner ended in October 1981, although she continued to see Petitioner after that. Houston further testified she did not recall seeing Petitioner on March 25, 1982, but remembered hearing about a shooting that occurred that day. Houston also testified that she and Petitioner were together on the night after the shooting, but not on the night of the shooting. Bridges testified that Petitioner and Houston were in her home together on the evening of March 25, 1982. She also testified that Petitioner came out of the bedroom to take a call around 6:30 p.m. and then reentered the bedroom. She last saw Petitioner and Houston around 7:30 to 7:45 p.m. when she was preparing to attend a cosmetics party. To corroborate this testimony, the defense presented a receipt for cosmetics that were ordered by Bridges dated March 25,

1982.

The defense also challenged the prosecution's eyewitness testimony and offered Dr. Shomer, a psychologist, as an expert on eyewitness identification.  When questioned hypothetically with factors about the night of the murder described in Lewis's identification of Petitioner, Dr. Shomer opined that those factors might cause misidentification.  The defense also presented Dr. Golden, a forensic dentist, who testified that approximately one-eighth of the African-American male teenagers he had examined while working at a dentistry clinic had a stainless steel crown in the front of the mouth, like Petitioner.

In addition, Hayes testified that, on the evening of the murder, he had to steer around the station wagon and noticed that there was a person sitting on the passenger side and the windows were foggy and rolled up.

Joe Lewis, Patricia Lewis's husband, testified that Petitioner had been a member for four to five years of a neighborhood youth "cadet corps" he had organized.  As part of the cadet corps, Petitioner had been in the Lewis's backyard every day during that period and Lewis was sometimes there.  Mr. Lewis maintained a photo album containing pictures of the cadets, and Mrs. Lewis, he was sure, had seen the album.  Los Angeles Police Detective Michael Mejia, an investigating officer, testified that he was shown the album and noted that it contained Petitioner's picture.

Los Angeles Police Officer Jerry Jones testified that, on the night Dunn was shot, Hayes told him that the van driver's hands were on the steering wheel and it was the passenger in the van who had extended his arm holding a gun.

Furthermore, the defense questioned the motives of the prosecution's informant witnesses, Arthur Cox and John Gardner.  Mejia testified that Arthur Cox had sought to "cut a deal for information," and Petitioner had told Cox that Curtis Thomas had shot Dunn, although no charges were brought against Thomas.  Moreover, Ernest Cox testified that when he was housed in the same cell in the Los Angeles County Jail with his brother, Arthur Cox, he saw Arthur reading Petitioner's preliminary hearing transcript.  In addition, Ernest testified that Arthur told him that Arthur could receive a sentence of probation,

1  instead of a prison term, on a robbery charge pending against him if he could provide

2  information that would help the District Attorney convict Petitioner in this case.  Ernest

3  further testified that Arthur told him that Arthur had only pretended to know something

4  about Petitioner's case when speaking with Deputy District Attorney Jacobs and would need

5  to "find something."  On cross-examination, the prosecution questioned  Ernest if he was

6  testifying against his brother to avoid gang retaliation in Folsom prison where he was

7  serving a life sentence, although Ernest denied the allegation.

8      Defense counsel attempted to discredit Gardner in his cross-examination by

9  suggesting it was Gardner, rather than Petitioner, who said it was "Bone" (Dunn) who had

10  been killed.  Defense counsel also sought to expose Gardner's motivation for testifying

11  against Petitioner for benefits.  Although Gardner testified that the only thing he received

12  was relocation for himself and his mother, he acknowledged that he only received a

13  sentence of eight days in jail when he pled guilty to a charge of possession of marijuana for

14  sale.

15      Finally, Petitioner attempted to cast doubt on the thoroughness of the investigation

16  conducted into the available fingerprint evidence.

17      At the conclusion of the guilt phase trial, the jury found Petitioner guilty of first

18  degree murder of Dunn, and found true the allegations that he was a principal armed with

19  a firearm and he personally used a firearm in the commission of the offense.  Subsequently,

20  Petitioner admitted a prior murder special circumstance allegation in the Dunn case.

21      **B.**    **Penalty Phase Trial**

22      At the penalty trial, the prosecution submitted evidence regarding Petitioner's

23  involvement in a shooting at a church carnival (cakewalk incident), through the testimony

24  of Karry Island (aka, Kerry Island), Mary Nixon, Barbara Nixon, and Deontray Turner.  The

25  prosecution's evidence showed that Petitioner was the leader of the attack, and the one who

26  fired the first shot and yelled, "This is Neighborhood Family Blood 89th Street."  There were

27  criminal charges filed against Petitioner in connection with this incident, but the case

28  ultimately was not prosecuted.

7

1    In addition, the prosecution submitted evidence regarding the Billingsley murder in

2    Green Meadow Park through the testimony of Arthur Cox and eyewitnesses, including Lea

3    Stoneham.  Arthur Cox also testified that he attended a meeting at Margot Bridges's house

4    in June 1981, which was attended by seven or eight 89th Street Family Bloods and led by

5    Petitioner and Junior Bridges.   The purpose of the meeting was to plan a shooting of the

6    members of the Green Meadows Park Boys gang and the Avalon Garden Crips gang at

7    Green Meadows Park.  Petitioner selected a .357-caliber handgun to use from shotguns and

8    handguns laid out on the floor at the meeting.  They were planning to go to the park in a

9    blue Cadillac belonging to a fellow gang member known as "Hang Bang."

10   Stoneham testified that she had known Petitioner since elementary school and worked

11   as a pool attendant at Green Meadows Park.  In addition, she testified that she saw a blue

12   Cadillac, which she recognized from the neighborhood, that belonged to "Bang."  Five or

13   ten minutes later, Stoneham saw Petitioner and one other person walk towards the stage.

14

15   Carol Freeman testified that she was among a group of about 10 people around an

16   outdoor stage at Green Meadows Park that night, and no one had weapons.   Freeman

17   testified that she saw Petitioner and one other person shooting at a group of people from

18   behind nearby bushes.  Specifically, she described how Petitioner fired through a gap in the

19   bushes.  Carol Freeman and Anthony Debose sustained shooting injuries, and Billingsley

20   was killed by a bullet that Petitioner's weapon was capable of firing.

21   Arthur Cox testified that he went back to Margot Bridges's house after Billingsley

22   had been shot, and Petitioner and others were there discussing what had happened the prior

23   night at Green Meadows Park.  Petitioner said he did not shoot the person who died from

24   a shotgun wound, as he had been carrying a .357-caliber weapon.

25   In addition, the prosecution entered into evidence a certified copy of Petitioner's

26   guilty plea in connection with a charge of possessing a handmade "shank" while he was in

27   Los Angeles County Jail awaiting trial.

28   In Petitioner's defense at the penalty phase, Petitioner's aunt, Lena Bridges testified

8

that Petitioner's mother had abandoned him when he was three days old and Petitioner was raised by Bridges and Petitioner's grandmother.   Various residents of Petitioner's neighborhood testified that Petitioner was a person of good character and did not deserve the death penalty.

Petitioner's wife, Dawn Williams, testified that they had known each other for more than five years and they were married while Petitioner was in custody.  She testified that she married him because she loved him and liked the way he understands people and is warm-hearted.  She did not believe he should receive the death penalty.

Joe Lewis, Patricia Lewis's husband, testified that he ran a youth community group called the Southeast Cadet Corps in 1967 after the Watts riots.  It was a quasi-military group, teaching only discipline and control, not weaponry.  The members drilled five days a week, and Petitioner was a member of the Cadet Corps until he became a gang member.  Mr. Lewis testified that Petitioner was one of the better boys in the group, moving from "private" to "second lieutenant."  In order to achieve such a promotion, a cadet was required to have recommendation letters from teachers and people in the neighborhood.

Jeanette Houston was the mother of Petitioner's son, Damien, who was five years old at the time of trial.  When she was eight months' pregnant with Damien, Houston was shot by a Crip gang member.  Even though he had been shot, Petitioner had tried to protect her.

Finally, Petitioner testified at the end of the penalty phase.  He testified that the weapon he possessed in jail was for his protection because he had been placed in a Crips section.  He further testified that he was not the shooter at the cakewalk incident, although he could not recall where he had been on the day the incident occurred.  He voluntarily went to the police station when he learned the police were looking for him in connection with that incident and spent 12 days in custody.  He had ongoing disputes with Karry Island, a principal witness against him in the cakewalk incident, because Island originally had wanted Petitioner and his friends to become Crips.

In addition, Petitioner testified that he dropped out of the Bloods when his son was born.  Petitioner worked to support his son and often spent time with him.  Petitioner

1   testified that items the police had taken from his home indicating gang membership after

2   1980 were simply relics of his past gang association.

3       Margaret Bennett, a clinical psychologist, testified that she had evaluated Petitioner

4   and her tests and interviews were not consistent with the charges against him.  She testified

5   that Petitioner did not appear to have the "personality structures" or "levels of violence or

6   anger" to indicate his capability to commit the murders with which he was charged.  She

7   could only explain Petitioner's behavior as resulting from his long-term association with

8   gangs.  Although she acknowledged that gang involvement in prison would enhance the risk

9   that an inmate would be violent, she did not anticipate that Petitioner would be violent or

10  hostile in prison.

11      After the penalty trial, Petitioner was sentenced to death on July 11, 1986.

12  **II.    Procedural Background**

13      On appeal, the California Supreme Court affirmed Petitioner's conviction and

14  sentence.  Williams, 16 Cal. 4th 153.  Shortly thereafter, the United States Supreme Court

15  denied certiorari.  Williams v. California, 522 U.S. 1150 (1998).  Petitioner filed his first

16  state habeas petition on November 21, 1995, which the California Supreme Court denied

17  on September 18, 2000.

18      This case commenced on January 4, 2000, when Petitioner filed his request for

19  counsel.  On September 18, 2001, Petitioner filed his initial Petition.  On that same day, he

20  also filed an exhaustion petition in the California Supreme Court.  On March 7, 2002,

21  Respondent filed a motion to dismiss the Petition and, on April 5, 2002, Petitioner filed a

22  motion to stay the federal proceedings pending resolution of state habeas proceedings.  In

23  an October 10, 2002 Order, the Court granted a stay of the federal litigation.

24      Following the denial of Petitioner's exhaustion petition in state court, proceedings

25  resumed in this Court and Petitioner's First Amended Petition (FAP) was deemed filed as

26  of December 23, 2003.[2]    Respondent filed an Answer on May 13, 2004.  Thereafter,

27  _____

28          [2]      The 2001 exhaustion petition presented the same claims set forth in the FAP.  (FAP at 7.)

10

Respondent filed a Motion to Dismiss various claims on the grounds that they were procedurally defaulted, and the Court issued an order striking it without prejudice on February 15, 2007. On December 26, 2007, the Court granted discovery of the agreed-upon items set forth in the parties' Joint Stipulation and, on February 19, 2008, resolved the remaining discovery disputes.

On July 31, 2009, Petitioner filed the Motion for Evidentiary Hearing (MEH), and this briefing closed on January 28, 2010. The MEH briefing was based in part on discovery taken during these federal habeas proceedings. While the MEH was under submission, the Supreme Court issued opinions in <u>Cullen v. Pinholster</u>, 563 U.S. 170 (2011), and <u>Walker v. Martin</u>, 562 U.S. 307 (2011). The Court then directed the parties to brief any impact these decisions might have on the MEH. In a March 6, 2012 Order, the Court rejected Petitioner's arguments that <u>Pinholster</u> had no impact on his entitlement to an evidentiary hearing and, instead, found that an evidentiary hearing should not be granted unless Petitioner satisfied 28 U.S.C. § 2254(d) based solely on the state court record. (March 6, 2012 Order at 12.) In addition, the Court denied Petitioner's ineffective assistance claims and juror-related claims, and directed the parties to brief the merits on the record that was before the California Supreme Court as to all other claims on which Petitioner sought an evidentiary hearing. (<u>Id.</u> at 69.) On December 10, 2013, the Court issued an order granting discovery and an evidentiary hearing as to certain prosecutorial misconduct claims, and denying the remaining claims.

**III.   <u>Evidentiary Hearing, March 12, 2015 through April 30, 2015</u>**

On March 12, 2015, an evidentiary hearing as to certain prosecutorial claims commenced. John Gardner testified regarding his involvement in Petitioner's trial, but his health was poor he did not have a good memory. (March 12, 2015 Reporter's Transcript (RT) Vol. 1 at 1-83, 259-63.)

Dr. Beth Chrisman testified as a handwriting expert and compared various handwriting exemplars in order to determine the author of several documents. (March 12, 2015 RT Vol. 1 at 104-15.) The parties stipulated that Dr. Chrisman's direct examination

could proceed through her report.

Mark Hammond, a paralegal from the Office of the Federal Public Defender (FPD), testified that he had reviewed trial counsel's files and testified as to whether certain documents were contained in those files. (March 12, 2015 RT Vol. 1 at 116-30.) Hammond further testified about his participation in a crime scene reconstruction that was conducted on March 25, 2014, the same day and time as the Dunn murder. (Id. at 130-38.)  A video was played of the crime scene reconstruction. (Id. at 138.)  In addition, Bob Snook testified regarding the creation of the crime scene reconstruction video. (Id. at 161-75.)

Frank Ferguson testified regarding his interview of Cox in June 1994 while he was working with the ACLU representing Petitioner in his state habeas proceedings. (March 12, 2015 RT Vol. 1 188-207.)

Alvin Henley, a retired Los Angeles County Deputy Sheriff who worked at the Los Angeles Central Jail from 1981 to 1992, testified regarding the jail's practices of placing informants within the jail. (March 12, 2015 RT Vol. 1 213-53.)

James Jacobs, a former Deputy District Attorney testified. (March 12, 2015 RT Vol. 2 at 284-319.)

Alexandra Natapoff, a professor at Loyola Law School, testified about the misuse of jailhouse informants in the Los Angeles County Jail system during the 1980s. (March 12, 2015 RT Vol. 2 at 319-64.)

At the conclusion of proceedings on March 12, 2015, the Court issued a bench warrant for Arthur Cox, who failed to appear at the hearing after being subpoenaed. An officer for the United States Marshal Service located Arthur Cox and Cox agreed to appear in Court to testify. Consequently, the evidentiary hearing resumed on April 23, 2015, for the purpose of obtaining Cox's testimony. (April 23, 2015 RT at 9-83.)

On April 30, 2015, the evidentiary hearing continued. John Hammond again testified regarding his interview of Arthur Cox and his draft of a declaration summarizing the interview that Cox signed in June 2001. (April 30, 2015 RT Vol. 1 at 7-34.)

James Jacobs again testified regarding the use of Arthur Cox as an informant in the

Dunn murder case.  (April 30, 2015 RT Vol. 1 at 34-170.)

Carmen Trutanich testified regarding his prosecution of Petitioner in the Dunn murder case, as well as the investigation of the second eyewitness (Arlene McKay, aka Jean Rivers) in the car with Patricia Lewis and the use of John Gardner and Arthur Cox as informants.  (April 30, 2015 RT Vol. 1 RT at 170-212; April 30, 2015 RT Vol. 2 at 4-87; April 30, 2015 RT Vol.3 at 4-45.)

Jim Bell, an investigator for the District Attorney's Office, testified regarding his investigation of witnesses in connection with Petitioner's trial.  (April 30, 2015 RT Vol. 3 at 46-78.)

Joe Holmes, a retired Los Angeles Deputy Sheriff's investigator, testified regarding his discussions with John Gardner and the use of Gardner as an informant in the Dunn murder case.  (April 30, 2015 RT Vol. 3 at 79 -124.)

## IV.   **Post-Evidentiary Hearing Briefing**

Following the evidentiary hearing, Petitioner's Post-Hearing Brief was filed on September 14, 2015; Respondent's Post-Hearing Evidentiary Hearing Brief was filed on October 12, 2015; and the Reply in Support of Petitioner's Post-Hearing Brief was filed on October 26, 2015.  In addition, on September 14, 2015, Petitioner filed a Motion for Order to Expand the Record Pursuant to Habeas Rule 7; on October 30, 2015, Respondent filed an Opposition To Petitioner's Motion to Expand the Record Pursuant to Habeas Rule 7 (MTE); and on November 13, 2015, Petitioner filed a Reply.  On November 17, 2015, the Court granted the MTE in part and denied it in part.

## DISCUSSION

## I.   **Standards**

The amendments to 28 U.S.C. § 2254 effected by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) govern the FAP, because this case was filed after the effective date of that statute.  Woodford v. Garceau, 538 U.S. 202, 210 (2003).  Under the AEDPA, a state prisoner whose claim has been "adjudicated on the merits" cannot obtain federal habeas relief unless that adjudication:  "(1) resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2).  Because Petitioner's claims in the FAP were adjudicated on the merits, he was required to satisfy either § 2254(d)(1) or § 2254(d)(2) in order to obtain relief in this case.

As set forth in the December 10, 2013 Order, for the claims that Petitioner demonstrated a violation of either § 2254(d)(1) and/or § 2254(d)(2) on the basis of the record that was before the state court, the Court granted an evidentiary hearing.  (December 10, 2013 Order at 69-70); See Pinholster, 131 S. Ct. at 1400 (holding that a district court must make the § 2254(d) determination prior to eliciting further evidence at an evidentiary hearing, because  "evidence introduced in federal court has no bearing on § 2254(d)(1) review.").

Now, in rendering the following decision, the Court reviews de novo the evidence elicited through discovery and at the evidentiary hearing in these proceedings and is no longer constrained by the limitations imposed by § 2254(d).  Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008) ("In sum, where the analysis on federal habeas, in whatever order conducted, results in the conclusion that § 2254(d)(1) is satisfied, then federal habeas courts must review the substantive constitutionality of the state custody de novo."); See also, e.g., Williams v. Woodford, 859 F. Supp. 2d 1154, 1161 (E.D.Cal. 2012) (Kozinski, J., sitting by designation).

## II.   **Prosecutorial Misconduct**

In these proceedings, the Court must determine whether Petitioner has established certain prosecutorial misconduct claims that he alleges pursuant to Napue v. Illinois, 360 U.S. 264, 269 (1959), and Brady v. Maryland, 373 U.S. 83 (1963).

In Napue, the Supreme Court held that a prosecutor's knowing presentation of false evidence violates a defendant's right to due process.  Napue, 360 U.S. at 269; United States v. Agurs, 427 U.S. 97, 120-21 (1976).   "[T]he knowing use of false testimony to obtain a

conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared." United States v. Bagley, 473 U.S. 667, 679 n.8 (1985).  In order to prevail on a Napue claim, a petitioner must demonstrate that: (1) the testimony or evidence was actually false; (2) the prosecution knew or should have known that the testimony or evidence was actually false; and (3) the false testimony was "material."  Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (quoting United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003)).

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either wilfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

In order to assess their materiality, Napue and Brady violations should be considered collectively.  Jackson v. Brown, 513 F.3d 1057, 1071 (9th Cir. 2008) (stating that courts should evaluate the "cumulative effect of the prosecutorial errors for purposes of materiality separately and at the end of the discussion.") (citing Kyles v. Whitley, 514 U.S. 419, 436 n.10 (1995)) (internal quotation marks omitted).  Specifically, Napue errors should be considered collectively first.  Jackson, 513 F.3d at 1076.  If the Napue errors are not material standing alone, the Court must consider the Napue and Brady errors together and determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id.

**III.    Prosecutorial Misconduct Claims in connection with John Gardner's Testimony**

In the December 10, 2013 Order, the Court found that Petitioner had demonstrated a violation of § 2254(d) and was entitled to explore at an evidentiary hearing his Napue allegations in Claims 1(B), 4(B) and (E), and 11(E)  pertaining to Gardner's testimony

implicating Petitioner in the Dunn murder and additional benefits Gardner received in connection with a robbery. (December 10, 2013 Order at 27.)  In addition, the Court allowed Petitioner to explore allegations as to whether Gardner received drug rehabilitation from the prosecution as an additional benefit for providing testimony. (Id. at 27 (citing Townsend, 372 U.S. at 318).)  The Court further found that Petitioner was entitled to explore at an evidentiary hearing his Brady allegations regarding Gardner's false testimony and additional benefits, as well as his Brady allegations that the prosecution "coached" Gardner's testimony. (December 10, 2013 Order at 52-53.)

Prior to trial, on Mach 25, 1985, the prosecution videotaped Gardner's statement to Deputy Holmes and Gardner also signed a written statement implicating Petitioner in the Dunn murder. (Pet.'s Evid H'g Ex. 78.)  At trial, Gardner testified that he saw Petitioner on the evening after the Dunn murder around 9:00 p.m. and a week and a half later, and Petitioner told him on both occasions that he "took someone out of the box" -- a street term meaning that he had killed someone. (RT at 7035-38.)  Gardner testified that Petitioner identified this person as "Silky" but later said under his breath that it was "Bone." (RT at 7039-40.)  Gardner further testified that the only benefit provided to him by law enforcement in exchange for testifying against Petitioner was "relocation"of Gardner and his mother from Compton to another location. (RT at 7046, 7070.)

On cross-examination, Gardner testified that he had told Holmes about his participation in a burglary or robbery of a bakery occurring on the same day as the Dunn murder, but he was never charged or prosecuted for that crime. (RT at 7064-67.)  When asked if it was a "favor" from Holmes, Gardner responded "[c]all it what you want." (RT at 7066.)  In his closing argument, defense counsel reminded the jury that Gardner and his family were relocated, and that the record supported further inferences that Gardner had received favorable treatment from law enforcement in connection with his marijuana conviction and robbery for testifying against Petitioner. (RT at 8274, 8340.)

In these federal habeas proceedings, Petitioner supported this claim with the following evidence:   1995 State Pet., Ex. 158 (May 11, 1994 Declaration by Gardner

stating that:  as part of his agreement to testify against Petitioner, a robbery case against him was not prosecuted; Gardner never heard Petitioner say that he was responsible for killing anyone; Gardner was relocated along with his family to public housing as part of his agreement to testify and Detective Bell bought him $300 worth of groceries and paid the mover's fee; and Gardner received a check for $400 to $500 after he testified); 1995 State Pet., Ex. 165 (handwritten note stating:  "Patricia Lewis, 884 E. 50th, LA, CA, Wed. Noon, Re-locate + Dry-out program, Dry-out cocke program, B.B. Baby-Boy [Gardner's gang name], Withers Assistance"); and FAP, Ex. 18 (July 24, 2001 Declaration signed by Gardner stating that:  "Trutanich basically told me that either Barry was going to do time for the murder or I was going to do time for the robbery"; Gardner agreed to testify against Petitioner and "Trutanich and his people coached me and told me what to say on the stand" even though "I have never heard Barry Williams say that he was responsible for killing anyone"; "I am absolutely certain that Barry Williams was not part of [the] group" of Blood gang members who went to the Green Meadows Park on the night Billingsley was killed; and Junior Bridges came to the home of the Moody family on the night Dunn was killed and had a recently-fired gun that he wanted hidden and was never found.)

In addition, Petitioner deposed Gardner in this case in 2008.  In his deposition, Gardner testified that Holmes initially approached him in connection with a murder, and then he met with Holmes, Bell, and Trutanich. (Resp.'s Evid. H'g Ex. 2 (Gardner Depo. at 14-15).)  Gardner stated that, in exchange for his testimony, these men offered him "[r]elocation, a drug program and no jail time" in connection with a robbery for which he faced up to five years in prison.  (Id. at 16.)  Gardner stated that the officers told him that they wanted him to specifically testify that "Barry was the one who did the shooting."  (Id.)  Prior to that, Gardner had not told these men or anyone else that Petitioner was responsible for shooting Dunn.  (Id.)  Gardner further said that Bell and Trutanich told him "how to say what happened that didn't happen."  (Id. at 18.)  His testimony at trial that Petitioner told Gardner that he had shot Dunn was not truthful.  (Id. at 22.)  After Gardner found out about the verdict, he tried to call the prosecutor to tell him that he had lied but nothing was done.

17

(Id. at 23-24.)   Gardner remembered being approached by the ACLU and signing a declaration stating that his trial testimony was not truthful because he wanted to "set everything straight" and "make everything right." (Id. at 41-42.) Gardner also remembered signing a similar declaration in 2001, stating that he wanted to "set the record straight" and that he was "coached" and "lied" at Petitioner's trial.  (Id. at 47.)

At the evidentiary hearing on March 12, 2015, Gardner testified that his health was poor and he was taking numerous medications which impacted his memory. (March 12, 2015 RT Vol. 1 at 15-16.) He did not recall testifying at Petitioner's trial in 1986, nor that he was facing charges for any crimes at that time.  (Id. at 19-20, 56.)  He did not recall having previously been in counseling for a drug problem.  (Id. at 33.)  However, Gardner testified that he smoked "sherm" (PCP) daily in 1985.  (Id. at 28.)  Despite counsel's attempts to refresh his recollection by showing Gardner his deposition testimony, Gardner did not have any independent recollection of his statements to law enforcement in 1985, the substance of his testimony at Petitioner's trial, the Dunn murder, his 1994 declaration, or any statements that he had made indicating that his trial testimony was not true.  (Id. at 56-60, 64, 80.)   Gardner recalled Petitioner, and remembered that Petitioner was a member of the Bloods street gang, but did not recall whether he told law enforcement that he saw Petitioner with a gun.  (Id. at 76.)  Gardner recalled that he moved, but does not remember being in protective custody.  (Id. at 69.)  Gardner did not recall being an informant for Deputy Holmes in other cases.  (Id. at 77.)

Kevin Fletcher testified at the evidentiary hearing that he knew Gardner growing up as "Baby Boy," and they had similar friends.  (March 12, 2015 RT Vol. 1 at 92-93.) Although Gardner had stated that Fletcher was present when Petitioner told Gardner that he shot Bone, Fletcher testified that Petitioner had never said anything to that effect.  (Id. at 94.)  In March 1982, Fletcher was 12 years old and affiliated with the Bloods.  (Id. at 96.) Petitioner was over 18 years old at that time.  (Id.)

Jim Bell testified that he did not remember much about this case due to the passing of time.  (April 30, 2015 RT Vol. 3 at 59.)  He recalled that drug rehabilitation for Gardner

1    was something that might have been discussed prior to Petitioner's trial. (Id. at 60.)

2          Joe Holmes, a retired Los Angeles County Deputy Sheriff, testified regarding his

3    investigation of the Dunn murder and his interviews with Gardner. (April 30, 2015 RT Vol.

4    3 at 79-124.) Holmes recalled that Gardner was a reliable informant who was affiliated with

5    the 84 Swans (Bloods) street gang and, between 1983 and 1984, Gardner had provided

6    Holmes 25 pieces of information that led to 15 search warrants. (Id. at 80, 87.) At the time

7    the Holmes contacted Gardner regarding information on the Dunn murder in 1985, Holmes

8    recalled that Gardner was on probation for a marijuana violation. (Id. at 81-83.) Holmes

9    spoke to Gardner's probation officer about Gardner's assistance, but Holmes never made

10   any inducements or promises in connection with Gardner's assistance with the Dunn

11   murder. (Id.) Holmes recalled that Gardner had committed a marijuana violation and had

12   broken into a bakery to steal pies, cakes, and drinks in 1982. (Id. at 89.) Holmes never

13   knew Gardner to be a drug user. (Id. at 97.)

14         When counsel questioned Holmes about the videotaped interview on March 25, 1985,

15   Holmes testified that no one else was present during the videotaped interview with Gardner,

16   aside from the videographer. (April 30, 2015 RT Vol. 3 RT at 114, 116.) Nevertheless, in

17   a tape of this interview, there is a knock on the door and Trutanich's name is heard. (Id. at

18   114-15.) Despite the fact that the video shows that Holmes looks away from the camera

19   to read something and Holmes's statement to Cox in the video appears to be the instructions

20   written in a note identified to be Trutanich's handwriting by Dr. Chrisman, Holmes testified

21   that he did not remember being handed any notes. (Id. at 115-16.) Although a transcript

22   of Gardner's interview with the prosecution team identifies Trutanich as present, Holmes

23   did not recall it. (Id. at 114-16.)

24         In determining this claim, a pivotal issue is whether the Court should credit Gardner's

25   statements in his 1994 and 2001 declarations and Gardner's 2008 deposition testimony

26   recanting his trial testimony that Petitioner admitted the Dunn murder to him and his trial

27   testimony that he received nothing aside from relocation as a benefit in exchange for his

28   testimony. Generally, recanted testimony is viewed with suspicion. See, e.g., Dobbert v.

1  Wainwright, 468 U.S. 1231, 1233, 105 S. Ct. 34, 36 (1984) (Brennan, J., dissenting from

2  denial of certiorari and stating "Recantation testimony is properly viewed with great

3  suspicion"); United States v. Leibowitz, 919 F.2d 482, 483 (7th Cir. 1990) ("Judges view

4  recantation dimly").

5        **A.    Napue Claims pertaining to Gardner**

6        Here, Petitioner cannot establish that the prosecution knowingly elicited false

7  testimony from Gardner in violation of Napue.  Moreover, Petitioner has not met the heavy

8  burden to show that Gardner ever effectively recanted his trial testimony implicating

9  Petitioner in the Dunn murder.  Gardner's testimony at trial was subjected to thorough

10 cross-examination and was consistent with his March 25, 1985 videotaped and written

11 statements.  (Pet.'s Evid. H'g Ex. 77; Resp.'s Evid H'g Ex. 3.)  Furthermore, Gardner's

12 testimony at the evidentiary hearing that he had no independent memory of testifying at

13 Petitioner's trial provides no basis to conclude that Gardner's trial testimony implicating

14 Petitioner was false.

15       Aside from relocation, the evidence does not establish that Gardner received

16 additional benefits from the prosecution in connection with a bakery robbery.[3]

17 Respondent's point is well-founded that, aside from Gardner's statements, Petitioner fails

18 to present any evidence showing Gardner's involvement in a robbery of a bakery.  This

19 petty theft of baked goods and drinks described by Gardner was likely never reported and,

20 because it occurred three years before Gardner spoke with Holmes, the statute of limitation

21 had probably expired.  See Cal. Penal Code § 802(a) (stating generally that the statute of

22 _____

23       [3]     To the extent that Holmes testified at the evidentiary hearing that Trutanich was not present

24 during the March 25, 1985 videotaped interview with Gardner and that Holmes did not read a note provided
   by Trutanich stating that Gardner was not promised anything in exchange for his testimony, Holmes's

25 testimony was not credible.  (See also Resp.'s Post-Evid. H'g Br. at 17 n.24 (conceding Trutanich was
   present and citing RT 7177 (Holmes's trial testimony that Trutanich was present at the beginning of

26 Gardner's interview)).)  Although it would be unusual for Trutanich as the prosecutor in Petitioner's case
   to participate and/or be present at this interview, it would not have been improper.  Thus, Holmes's

27 testimony on this point does not impact the Court's conclusion as to whether Petitioner's Napue claim

28 based on Gardner's testimony is meritorious.

1  limitations for crimes not punishable by death or imprisonment is one year).  Moreover,

2  Holmes testified that he reported the robbery to the appropriate authorities and was not

3  aware that a case was ever brought against Gardner.  (April 30, 2015 RT Vol. 3 at 89.)  In

4  any event, the testimony from Holmes at trial and the evidentiary hearing further confirms

5  that Gardner was a seasoned informant with an obvious motive to testify in view of his

6  probable need for the relocation he received in exchange for testifying against Petitioner.

7  Gardner's trial testimony reiterating the statements that Gardner provided to law

8  enforcement three years following Dunn's murder was not significantly persuasive by itself

9  and mostly served to corroborate the more compelling evidence provided by Lewis and

10  Cox.  To the extent that there is some evidence that the prosecution helped Gardner to get

11  assistance with a drug problem, it appears to be nothing more than minimal assistance

12  routinely by the prosecution provided in order to ensure Gardner's testimony at Petitioner's

13  trial.  Thus, Petitioner is not entitled to relief on these allegations.

14        **B.**    **Brady Claims pertaining to Gardner**

15       For the reasons set forth above, the Court finds that Petitioner cannot demonstrate a

16  violation of <u>Brady</u> in connection with his allegations pertaining to Gardner.  The evidence

17  elicited at the evidentiary hearing failed to establish that Gardner received additional

18  benefits in connection with a bakery robbery or drug rehabilitation.  Furthermore, the

19  evidence does not support Petitioner's allegation that Gardner's testimony was "coached"

20  by the prosecution.  Accordingly, no relief is warranted as to the allegations that the

21  prosecution withheld material information pertaining Gardner's testimony.

22       Accordingly, the allegations in Claims 1(B), 4(B) and (E), and 11(E) are denied.

23  **IV.**   **<u>Prosecutorial Misconduct Claims in connection with Arthur Cox's Testimony</u>**

24       In the December 10, 2013 Order, the Court granted an evidentiary hearing based on

25  Petitioner's <u>Napue</u> allegations set forth in Claims 5(F) and 11(E) that Cox was given

26  immunity for the Billingsley murder.  (<u>See</u> December 10, 2013 Order at 30.)  The Court also

27  granted an evidentiary hearing on Petitioner's <u>Napue</u> allegations set forth in Claims 1(C),

28  5, and 11(E) pertaining to Cox's false testimony implicating Petitioner in the Dunn murder,

additional benefits Cox received in connection with a marijuana violation, and the false testimony presented at the pre-trial <u>Massiah</u> hearing on Cox's testimony.  (<u>Id.</u> at 32.)  In addition, the Court granted an evidentiary hearing based on Petitioner's <u>Brady</u> allegations in Claim 5(F) that Cox was provided additional benefits by the prosecution. (December 10, 2013 Order at 55-56 (citing <u>Milke v. Ryan</u>, 711 F.3d 998, 1008 (9th Cir. 2013).)  The Court further allowed Petitioner to explore at an evidentiary hearing his <u>Brady</u> allegations in Claim 1(C) and Claim 5 pertaining to the prosecution's failure to disclose that it "coached" Cox's testimony.  (<u>Id.</u> at 56.)

At trial, Cox testified that, several months after he was incarcerated for a robbery charge, Cox spoke to Petitioner, and Petitioner said that Curtis Thomas had shot "Bone" (Dunn) after Petitioner had told him to do so.  (RT at 7284, 7301.)  Cox also testified that Petitioner said that he was having someone shoot one of the witnesses. (RT at 7287.)  Cox stated that the only benefit he received for testifying against Petitioner was relocation and probation on the robbery charge (for which he had faced about 7 years), and he had received less than $500 for his relocation expenses.  (RT at 7301, 7304, 7307-08.)

## A.   Napue Claim based on False Testimony implicating Petitioner in the Dunn murder and regarding an Undisclosed Deal Given to Cox in connection with the Billingsley Murder

In his state habeas proceedings, Petitioner presented the following evidence in support of this claim:   2001 State Pet., Ex. 10 (August 18, 2001 Declaration from John Hammond, an investigator with the FPD, stating that Cox told Hammond that: (1) Deputy District Attorney Jacobs had approached Cox and threatened to prosecute him as an accessory to the murder of Billingsley, which could result in a 15-25 year sentence to run consecutive with the time Cox would receive for his then-pending robbery charge, unless Cox agreed to testify against Petitioner; and (2) Jacobs offered Cox immunity regarding the Billingsley murder and a cash payment for his testimony); and 2001 State Pet., Ex. 13 (handwritten declaration dated July 31, 2001, signed by Cox, stating that the District Attorney initially approached him regarding the Billingsley murder and offered Cox

22

immunity if he testified against Petitioner, and further stating that "I lied on the stand against [Petitioner] because I didn't want to do the 25 years which would have run concurrently with my armed robbery case.").

In his 2008 deposition, Cox testified that Detective Mejia contacted him about testifying against Petitioner while Cox was in the Los Angeles County Jail. (Pet.'s Evid. H'g Ex. 118 at 12-13.) Cox testified that the police told him that they could charge Cox as an accessory before and after the fact in connection with Billingsley's murder, such that he would face 25 years for the accessory charge in addition to the time Cox would receive for his armed robbery. (Id. at 13, 18-19.) Cox testified that he could not remember whether Petitioner told him that he killed "Bone" (Dunn). (Id. at 23-24.) He also testified that he could not remember whether Petitioner told him that he had plotted to have a witness shot. (Id. at 26.) He testified that he remembered that Mejia and Jacobs came to talk to him about the Dunn murder in the Los Angeles County Jail, but he did not remember giving a recorded statement in connection with the Dunn murder. (Id. at 27-29.)

At the evidentiary hearing, Cox testified that recently was homeless and had been in drug rehabilitation, and his prior drug and alcohol abuse have impacted his memory. (April 23, 2015 RT at 11-12.) In addition, he testified that he had cancer and HIV, and had a "bag of medications" which have caused him not to be able to remember things as well as he did several years ago. (Id.) Cox testified at evidentiary hearing that he testified truthfully against Petitioner at Petitioner's trial. (Id. at 13-14, 41.) Cox did not recall his 2008 deposition or his 2001 declaration. (Id. at 39.) When shown a 2001 declaration stating that he did not testify truthfully at Petitioner's trial, Cox said that it was not accurate. (Id. at 41.) Although Cox agreed that he signed this declaration, Cox explained that "they're not my words" because the declaration was written by someone else (Id. at 78.) After refreshing his memory with his 2008 deposition, Cox testified that he thought that law enforcement would have been able to charge him with "accessory after the fact" for the Billingsley murder when they first questioned Cox. (Id. at 36.) When questioned about what law enforcement asked Cox about the Dunn murder in 1982, Cox testified that "they knew what

I knew." (Id. at 38.)  Cox testified that he had been living on the street prior to the trial for the Dunn murder, and that he had been housed in a motel and provided food during the trial. (Id. at 47.)

Jim Jacobs, who was the prosecutor investigating the Dunn and Billingsley murders prior to Trutanich's involvement, testified at the evidentiary hearing that he interviewed Cox and determined that Cox was "the fly on the wall" but was not an accessory or participant in the Billingsley murder.  (April 30, 2015 RT at 49.)  Jacobs testified that he told Cox during the July 1982 meeting at the Los Angeles County Jail that, if Cox had been at a planning meeting, "now is the time to come clean."  (Id. at 52.)  However, Jacobs testified that Cox never asked for immunity and Jacobs never offered it at this meeting.  (Id.)

Frank Ferguson testified regarding his interview of Cox in June 1994 while he was working at the ACLU, which represented Petitioner in his state habeas proceedings. (March 12, 2015 RT at 189.)  Ferguson testified that he interviewed Cox regarding his testimony at Petitioner's trial.  (Id.) Specifically, Cox told Ferguson that law enforcement had told him that he would receive prosecutorial immunity for the Billingsley murder in exchange for providing testimony in the Dunn murder case.  (Id. at 198.)  Ferguson drafted a declaration after meeting with Cox.  (Id. at 205.)

Hammond, an investigator with the FPD, testified that he met with Cox at his apartment in 2001.  (March 12, 2015 RT Vol. 1 at 209-10.)  Although Cox "rambled a bit" during the interview, Hammond could understand him and Cox appeared sober. (Id. at 209.)

Trutanich testified that Cox had been housed in a motel during the trial for the purpose of "keep[ing] him alive to testify."  (April 30, 2015 RT Vol. 2 at 78.)  Whatever money had been given to Cox was for meals and not a substantial amount.  (Id.)  On July 15, 1982, when Mejia and Jacobs met with Cox and recorded his statement, Trutanich was not involved in the case; Trutanich was not transferred to "hardcore" gang prosecutions until 1983.  (Id. at 42.)

Here, Petitioner has not shown a Napue violation based on these allegations.  Similar to Petitioner's allegations regarding Gardner, Petitioner is seeking the Court to find that Cox

24

recanted his trial testimony regarding Petitioner's incriminating statements to him and that Cox received no additional benefits in connection with his testimony. Nevertheless, Petitioner has not met the heavy burden to succeed on these allegations. Despite the fact that Cox's 2001 declaration supports the conclusion that he testified falsely about the incriminating statements Petitioner made to him and that Cox was promised immunity for the Billingsley murder, Cox's deposition and evidentiary hearing testimony do not. Moreover, the Court found credible Jacobs's evidentiary hearing testimony that, although he encouraged Cox to "come clean" during their interview, he did not promise immunity in connection with the Billingsley murder.[4] Thus, neither the testimony of Jacobs nor Cox suggests that Cox was promised immunity for this crime. Accordingly, Petitioner is not entitled to habeas relief on these allegations.

### B.  Napue Claim based on False Testimony regarding an Undisclosed Deal Given to Cox in connection with Cox's Marijuana Violation

At trial, the defense argued that Cox was given a reduced sentence on the marijuana charge in exchange for testifying. The probation report recommended that Cox be sentenced to one year of incarceration at the Los Angeles County Jail and three years of probation in connection with his February 6, 1984 offense for selling marijuana to an undercover police officer. (1995 State Pet., Ex. 197.) However, Petitioner was sentenced to only three years of probation and 162 days in Los Angeles County Jail for his offense. (1995 State Pet., Ex. 90, 197.)

---

[4]     Petitioner relies upon United States v. Shaffer, 789 F.2d 682 (9th Cir. 1986), for the assertion that "[a]n implied threat of prosecution, in combination with the fact that such a prosecution never occurs, is exactly the kind of tacit promise that must be disclosed under Brady." (Pet.'s Post H'g. Br. at 14.) However, Petitioner's reliance upon Shaffer is misplaced. In Shaffer, the government failed to disclose that the informant had acquired significant assets through drug profiteering for which the government had failed to initiate asset forfeiture proceedings to acquire. The Ninth Circuit found that these coupled facts "implie[d] a tacit agreement was reached" between the informant and government in exchange for his cooperation. Id. Unlike the evidence establishing the informant's acquisition of drug profits in Shaffer, there was no evidence establishing Cox's participation in the Billingsley murder to support a tacit, implied agreement between the prosecution and Cox.

In response to this questioning, the prosecution elicited testimony from Judge Shook that he sentenced Cox in connection with this marijuana violation and Cox did not receive any special consideration in connection with this violation.[5] (RT at 7677-79.) Judge Shook testified that he sentenced Cox after reviewing the file and listening to the attorneys, and that the district attorney never asked for any special consideration because Cox was a state witness. (Id.) In his closing argument, Trutanich specifically pointed to Judge Shook's testimony as compelling evidence that the prosecution had made no deal with Cox regarding the marijuana charge. (RT at 8324.) However, in his state habeas proceedings, Petitioner presented evidence showing that Judge Thomas, not Judge Shook, presided over Cox's sentencing for this marijuana charge. (1995 State Pet., Exs. 87, 90 (state court files confirming that Judge Robert W. Thomas presided over Cox's guilty plea and sentence for the 1984 marijuana offense).)

In opposing these allegations, Respondent concedes that Judge Shook's testimony that he sentenced Cox was incorrect but has contended that Judge Thomas's testimony in the Billingsley trial[6] demonstrates that the substance of Judge Shook's testimony was correct. (See Resp.'s Post-Evid. H'g Br. at 12 n.20.) Specifically, Respondent pointed out that: Judge Thomas sentenced Cox for this violation; there was no deal in place; and Cox's sentence was standard punishment for his offense. (See Resp.'s Opp. to Mot. for Evid. H'g at 84 (citing Green Meadows Park (GMP) RT at 57–59).)

At the evidentiary hearing, Trutanich testified that he asked Judge Shook to testify at trial based on the representations made by defense counsel that Judge Shook had

---

[5]      Specifically, Judge Shook stated: "I placed the defendant on probation for a period of three years and one of the conditions of his probation was that he serve 162 days in the Los Angeles County Jail." (RT at 7678.) Judge Shook further explained his sentence: "Because that was the time he had already had in custody and I felt after reviewing the file and listening to the attorneys that that was sufficient time in jail." (Id.)

[6]      Trutanich served as the prosecutor in the Billingsley murder trial, which preceded the Dunn trial, when this testimony was elicited from Judge Thomas. (See RT at 6472; April 30, 2015 RT at 7-10.) .)

26

sentenced Cox in connection with his marijuana violation. (April 30, 2015 RT Vol. 3 at 7-9.) Trutanich further testified that, had he realized that Judge Thomas had sentenced Cox for this violation, he would have clarified the mistake. (Id. at 41.) Trutanich did not dispute that he called Judge Thomas to testify regarding the same thing (i.e., whether Cox received a deal in connection with his marijuana violation) at the Billingsley trial. (Id. at 7-9.) Trutanich even conceded that this was an unusual and "ballsy" move to have Judge Shook testify. (Id. at 9.) When questioned about his error in bringing the wrong judge to testify, Trutanich simply responded, "I brought the judge whose name they used."[7] (Id. at 10.)

Here, Petitioner has shown under the first prong of Napue that the prosecution presented false testimony from Judge Shook that he (not Judge Thomas) sentenced Cox for the marijuana violation and Cox received no deal. Trutanich's actions in eliciting testimony from the wrong judge to testify as to Cox's marijuana sentence -- even though he had sought the same testimony from Judge Thomas the prior year -- was a negligent, yet inadvertent oversight in this case. Nevertheless, because Trutanich should have known that Judge Shook's testimony was not true, Petitioner has satisfied the second prong of Napue.[8] However, in view of the fact that Judge Thomas testified similarly regarding Cox's marijuana violation at the Green Meadows trial the year before, the error resulting from Judge Shook's testimony would have been minimal and does not demonstrate that the prosecution offered Cox an undisclosed "deal" in connection with this offense. But because the Court must consider materiality of Napue and Brady errors collectively, the Court will reserve judgment as to the ultimate error on this after reviewing all the prosecutorial misconduct claims. Jackson, 513 F.3d at 1071; Kyles, 514 U.S. at 436 n.10.

---

[7] The record does not show any statements by defense counsel indicating that Judge Shook sentenced Cox for this crime. (See RT at 7595-97.)

[8] Respondent again maintains that there is no error because the defense had access to the court file regarding Cox's marijuana offense, relying up Routly v. Singletary, 33 F.3d 1279, 1286 (10th Cir. 1994). (Resp.'s Post-Evid. H'g Br. at 12 n.20.) However, the Court previously rejected this argument. (See December 10, 2013 Order at 32.).)

1

**C.**      <u>Napue Claim based on False Testimony in connection with Petitioner's</u>

2      <u>Massiah Motion</u>

3         **1.**      <u>Standards regarding Massiah</u>

4      The Supreme Court has found that the government violates the Sixth Amendment's

5 guarantee of a right to counsel when it uses an undisclosed agent to "deliberately elicit"

6 incriminating information from a defendant after he has been indicted and his right to

7 counsel has attached. <u>Massiah v. United States</u>, 377 U.S. 201, 206 (1964); <u>United States</u>

8 <u>v. Henry</u>, 447 U.S. 264, 270 (1980) (extended the rule in <u>Massiah</u> to the use of jailhouse

9 informants). In order to prevail on a <u>Massiah</u> violation, the defendant must show that: (1)

10 the informant was acting as an agent of the State when he obtained the incriminating

11 statements; and (2) the informant made some effort to stimulate conversations about the

12 crime charged. <u>Randolph v. California</u>, 380 F.3d 1133, 1144 (9th Cir. 2004).

13      In order to show that an informant is acting on behalf of the government, the court

14 must look to the "likely . . . result" of the government's acts, not necessarily the

15 government's intent or overt acts. <u>Id.</u> (citing <u>Henry</u>, 447 U.S. at 271). In <u>Randolph</u>, there

16 was no explicit deal under which the informant was promised compensation in exchange

17 for his testimony. <u>Id.</u> Although the Ninth Circuit accepted as true the State's contention

18 that the informant was told not to expect a deal in exchange for his testimony, it found that

19 "[i]t is clear that [the informant] hoped to receive leniency and that, acting on that hope, he

20 cooperated with the State." <u>Id.</u> Thus, law enforcement knew or should have known that the

21 informant hoped to received leniency if he provided useful testimony against the petitioner

22 at trial, which was "precisely what happened," despite the lack of an express agreement

23 between the informant and the government. <u>Id.</u> Furthermore, the Ninth Circuit found that

24 an explicit agreement was unnecessary, because there was "sufficient undisputed evidence

25 to show that the State made a conscious decision to obtain [the informant's] cooperation and

26 that [the informant] consciously decided to provide that cooperation," which rendered him

27 an agent of the State. <u>Id.</u>

28      In addition, the Ninth Circuit in <u>Randolph</u> rejected the district court's finding that

28

there was no evidence that the informant took action to deliberately elicit incriminating statements from the petitioner.  Specifically, in his testimony before the district court, the informant testified that he encouraged the petitioner to provide information by "being friendly and talkative" and by "lead[ing] [the petitioner] on" to provide him with information.  Id.  In finding that the petitioner had potentially established a Massiah violation, the Ninth Circuit explained:

> In this case, however, there is substantial evidence to support a conclusion that Opplinger and Chavez knew or should have known that [the informant] believed that he would receive leniency if he elicited incriminating statements from [the petitioner], circumstances sufficient to make [the informant] a government agent. Further, there is substantial evidence that, after meeting with Oppliger and Chavez, [the informant] took affirmative steps to elicit information from [the petitioner.]

Id. at 1117.[9]

## 2.   Petitioner's Pre-trial Massiah Motion and Trial Testimony by Arthur Cox

On July 15, 1982, prior to trial, Cox made a statement at the Los Angeles County Jail with Mejia and Jacobs present.  (Pet.'s Evid. H'g Ex. 12.)  In response to questioning about the Dunn murder, Cox responded that "Yes, Barry told me about this one" and that the victim was a Crip named "Bones or something like that."  (Id. at 30.)  Cox stated that Petitioner had told him that Petitioner had told Curtis to shoot Dunn.  (Id. at 31 ("[H]e told Curtis to bust on him but he didn't shot [sic] him. . . . he said Curtis didn't know the dude

---

[9]      However, in Randolph, because the district court did not find precisely when the informant first met with law enforcement and what the informant did to stimulate conversations with the petitioner about his crime, the Ninth Circuit held that it was unable to ultimately determine whether a Massiah violation occurred.  Id. at 1145.  There, the informant testified that he met with law enforcement twice, once before he obtained the incriminating statements and once after; however, the law enforcement deputies testified that they met with the informant after he had obtained the incriminating statements from the petitioner.  Id.  The district court was therefore directed to render a specific finding as to whether the petitioner's admission was made to the informant prior to the informant's meeting with law enforcement.  Id.

1    so I guess Barry knew him so Barry told him to bust on him.").)

2          After learning that the prosecution intended to call Cox as a witness at trial, the

3    defense brought a pre-trial motion challenging the admissibility of Cox's statements to the

4    prosecution and seeking to examine whether the prosecution fully and adequately notified

5    the defense of Petitioner's incriminating statements to Cox.  (Clerk's Transcript (CT) at

6    618; RT at 6489-27.)  The defense maintained that they had not been made aware of Cox's

7    involvement at the time of the preliminary hearing.  (RT at 6488.)  The questioning was

8    outside the presence of the judge and jury, and Cox was not sworn but a court reporter

9    recorded the questions and answers.  (RT 6485-87.)

10         At this pre-trial hearing, Cox testified that after he met with Jacobs and Mejia on July

11   15, 1982, Cox had another conversation with Petitioner in August or September of 1982,

12   in which Petitioner told him that he was going to have "Curtis" shoot Lewis.  (RT at 6491.)

13   In response to questioning about what preceded Petitioner making this statement, Cox stated

14   that "we were just talking about how he was going to beat his case."  (RT at 6515.)  When

15   questioned about why Petitioner would talk to Cox, Cox stated that "we were always talking

16   about our cases together."  (RT at 6516.)  Cox testified that he was alone with Petitioner

17   when Petitioner made this statement.  (RT at 6514.)  Cox testified that he called Mejia the

18   next day or day after Petitioner's statement to him.  (RT at 6492-93.)

19         Following the questioning of Cox, the defense objected to the admissibility of the

20   purported statements made by Petitioner that Cox relayed to Mejia on September 2, 1982,

21   based on the rule in Massiah.  (RT at 6527.)  At that point, Trutanich offered to call both

22   Mejia and Jacobs to testify as to whether Cox was an agent of the State at the time Petitioner

23   made the purported incriminating statements to Cox.  (RT at 6587.)

24         Next, Jacobs testified at the pre-trial hearing that when he was handling this case,

25   Mejia contacted him about Cox's information about this case and Jacobs knew of Cox

26   because Cox was a victim in the Boyd/Garrett case that Jacobs had handled.  (RT at 6594-

27   95.)  Jacobs testified that he did nothing to facilitate Cox in obtaining information from

28   Petitioner while Cox was housed in the Los Angeles County Jail with Petitioner.  (RT at

30

6680.)  Jacobs testified that the July 15, 1982 interview was conducted pursuant to an offer by Cox to supply more information in return for assistance with his pending robbery case. (RT at 6798.)  However, as Jacobs further testified, he told Cox that there would be no consideration given for information, but only for testimony.  (RT at 6798.)  In response to cross-examination about Jacobs's statement to Cox during the July 15, 1982 interview that he "would be interested to know what [Petitioner's] reaction is now," Jacobs testified that he was not asking Cox to get information from Petitioner and, in any case, Cox would not be able to obtain any information from Petitioner regarding that question because Cox was in a different module than Petitioner.  (RT at 6634-36.)  Jacobs testified that, to his knowledge, Cox had not been put in the informant tank and "the only reason I would move somebody in County jail would be to put them in protective custody."  (RT at 6908-09.)  In addition, Jacobs testified that no deal was in place until September 24, 1982, when Cox was offered a deal that limited the term on his robbery conviction.  (RT at 6798, 6803.)

District Attorney Peter Berman testified at the pre-trial hearing that he was in charge of authorizing deals with informants within the District Attorney's Office in September 1982.  (RT at 6750.)  Deals were conditioned upon an informant providing testimony.  (RT at 6749.)  Berman first became aware of Cox on September 24, 1982, when he received a memo from Trutanich regarding information supplied by Cox in Petitioner's case.  (RT at 6751-52.)  He granted the proposed disposition requested by Trutanich in the memo.  (RT at 6753.)  He further testified that there was no attempt to persuade Cox to obtain information from Petitioner.  (RT at 6753.)

Mejia testified at the pre-trial hearing that Cox initiated the first contact with him a week or a day prior to July 15, 1982, probably on July 10, 1982.  (RT at 6676.)  Mejia testified that this conversation with Cox occurred *after* the preliminary hearing in this case on July 7 and 8, 1982, which Mejia attended, and Mejia was simply responding to Cox's telephone call.  (RT at 6712-15.)  Mejia further testified that, although Cox stated that he wanted a deal for information, Cox was not promised anything of any nature and simply freely and voluntarily provided information.  (RT at 6677-79.)  Mejia confirmed that he did

31

nothing to facilitate Cox in obtaining any information from Petitioner.  (RT at 6680.)  The next time Mejia spoke with Cox was on July 15, 1983, and he once again told Cox that there would be no deal or promises given to him.  (RT at 6684.)  In September 1982, Cox called Mejia to tell him that Petitioner said he was going to use a friend by the name of Curtis Thomas to "get rid" of Lewis by killing her.  (RT at 6686-87.)

After this pre-trial hearing, the trial court denied the motion.  (RT at 6785-87.)  The trial court found that the evidence indicated that Cox had initiated the first interview on July 15, 1982, as well as the September 2, 1982 interview.  (RT at 6785-86.)  The trial court further reasoned that Cox was not promised anything until his robbery charge was resolved on September 24, 1983.  (RT at 6786.)

At trial, Cox testified that, several months after he was incarcerated at the Los Angeles County Jail for a robbery charge, Cox spoke to Petitioner, who told Cox that Curtis Thomas had shot Bone and Petitioner had told Thomas to shoot.  (RT at 7284, 7301.)  Cox further testified that when he first told Jacobs and Mejia about the Dunn shooting in June or July, no one spoke with him about being a witness.  (RT at 7280-85.)  After Petitioner made this statement to Cox, Cox testified that he called the detectives the next day or day after and relayed his conversation with Petitioner to Mejia and Jacobs.  (RT at 7292-93.)  Cox further testified that he did not receive a deal on his robbery charge for which he was facing seven years of incarceration until after Cox provided this information.  (RT at 7291-92.)  After Cox spoke with Mejia in September 1982, he was moved from the Bloods module.  (RT at 7290-91.)

On direct review, the California Supreme Court rejected this claim, reasoning that "Cox's telephone contact with the police regarding [Petitioner's] case was initiated by Cox himself"; "[t]here was no evidence prosecutors or police deliberately placed Cox in proximity to [Petitioner] in jail"; and Petitioner "failed to establish that Cox deliberately elicited [Petitioner's] statements."  Williams, 16 Cal. 4th at 204-06.

**3.    Evidence Presented in connection with This Claim in State and Federal Habeas Proceedings**

In his state habeas proceedings, Petitioner presented handwritten notes, jail records, and Mejia's sworn affidavit, indicating that Mejia interviewed Cox before the preliminary hearing in Petitioner's case on July 7 and 8, 1982. (1995 State Pet., Ex. 26, p. 65 (chart reflecting Cox was housed in module 2700 from June 22, 1982, to June 27, 1982, and transferred to module 4400 on June 28, 1982 to July 3, 1982); 1995 State Pet., Ex. 29 (handwritten notes of an interview of Cox while housed in module 2700); 1995 State Pet., Ex. 51, p. 216 (affidavit to search warrant completed by Mejia stating that he spoke with Cox prior to the preliminary hearing and that "Cox stated that he talked with Barry Williams while in custody at County Jail and that Williams told him if he (Williams) could get rid of witness Lewis he could beat both murders. Williams further stated that he would get Curtis Thomas (a neighbor of witness Lewis) to shoot her while she was hanging clothes.")) Petitioner also presented Cox's testimony at the November 8, 1982 Thomas and Whitfield preliminary hearing that, in contrast to Mejia's testimony at Petitioner's trial, law enforcement "came to [him]" and he did not initiate contact with them. (1995 State Pet., Ex. 106.)

Petitioner also presented the Grand Jury findings in the wake of the jailhouse informant scandal confirming that prosecutors offered informants rewards, and that "[t]he most significant rewards obviously involve a dismissal of charges, imposition of a lesser sentence, or reduction of a sentence already imposed." (1995 State Pet., Ex. 307, p. 75.)) Because this report documented abuses from 1976 to 1990, it covered the time period during which Cox testified. (Id. at 4.) The California Supreme Court summarily denied both Petitioner's 1995 and 2001 habeas petitions.

After concluding that the California Supreme Court erred in denying this claim, the Court granted an evidentiary hearing and further fact development in connection with this claim. (December 10, 2013 Order at 44-46.) Although Mejia would have been a necessary witness at this hearing, counsel for Respondent informed the Court at the evidentiary hearing that Mejia had passed away.

At the evidentiary hearing, Petitioner's handwriting expert, Beth Chrisman testified

1   that the module chart (Pet.'s Evid. H'g Ex. 22) was written by Jacobs and the handwritten

2   notes referencing a meeting with Cox in Module 2700 (Pet.'s Evid. H'g Ex. 86) was written

3   by Mejia.  (March 12, 2015 RT Vol. 1 at 109; Pet.'s Evid. H'g Ex. 4 (Chrisman Report.)

4        Jacobs testified at the evidentiary hearing that he went to meet with Cox after Mejia

5   first met with Cox in order to "get an eyeball on him." (March 12, 2015 RT Vol. 1 at 287.)

6   At that time, Cox was a victim in the Boyd/Garrett case, another case Jacobs was

7   prosecuting. (Id.) Mejia contacted Jacobs about talking to Cox about information "several"

8   days, or maybe "a week or two" before they met with Cox in the Los Angeles County Jail

9   on July 15, 2015.  (April 30, 2015 RT Vol. 1 at 62.)  Jacobs confirmed that he created a

10  hand-written chart in connection with the Garrett/Boyd case  (Pet.'s Evid. H'g Ex. 22),

11  which shows where Cox was housed in the Los Angeles County Jail from the time he was

12  arrested until he was released.  (Id. at 62.)  Although Jacobs did not know where Cox was

13  housed when Mejia first spoke with him about Cox, Jacobs later knew after creating his

14  chart where Cox was housed "pretty much every day from the time he was arrested to the

15  time he was released."  (Id. at 62, 64.)

16       However, Jacobs testified that he had "no independent knowledge" that Cox was

17  moved between the first time Mejia interviewed Cox and the time that Mejia called Jacobs

18  to go with him to the Los Angeles County Jail to go interview Cox.  (Id. at 66.)  Jacobs

19  never spoke with Cox prior to any movement around the jail before Cox was in Petitioner's

20  module (Module 4400).  (Id. at 70.)  Jacobs also testified that he did not request to move

21  Cox to Module 4400 (Petitioner's Module) from Module 2700, and would have wanted to

22  know why it was done.  (Id. at 66-67.)  Furthermore, Jacobs testified that he worked in

23  homicides for 40 years and "never in his career" would have moved an informant next to

24  a target.  (Id. at 83-84.)  (Jacobs identified Joe Reid as the officer who worked at the Los

25  Angeles County Jail and was knowledgeable as to movements between modules at this time.

26  (Id. at 145.)  However, counsel for Respondent later informed the Court that Mr. Reid was

27  deceased).

28       In addition, Jacobs testified that he had filed the charges for the Dunn murder against

34

Petitioner that were dismissed for lack of evidence on June 16, 1982. (April 30, 2015 RT Vol. 1 at 75-77.) Then, the defense presented evidence to the Court indicating that Mejia met with Cox between June 22 and June 27, 1982.[10] (Id. at 79-81; Pet.'s Evid. H'g Exs. 22, 86.) After that, there was a preliminary hearing for the Dunn murder on July 7 and 8, 1982, in which Petitioner was arraigned.  (Id. at 75.)

Defense counsel next questioned Jacobs at the evidentiary hearing about various statements he made during the July 15, 1982 interview with Cox.  During that interview, after Cox said that Petitioner "didn't want to talk about" the Dunn murder, Jacobs asked Cox "Well, how do you know he doesn't want to talk about it then, right?" (April 30, 2015 RT Vol. 1 at 96.)   Jacobs testified that this statement was not an invitation for Cox to go talk to Petitioner about the Dunn murder.  (Id.)  In addition, when Jacobs said, "I wonder what [Petitioner] thinks now" in the interview with Cox, Jacobs explained that he was "joking around" about "how strong the case was." (Id. at 155.) Jacobs testified that he was transferred from the Compton Hardcore Gang Unit to Norwalk in February 1983 and no longer worked on the case after that. (Id. at 116, 164.)

Trutanich testified at the evidentiary hearing that he recalled that Mejia and Jacobs testified at the pre-trial hearing regarding Cox's testimony in 1985, but that he was not assigned to the case when Mejia and Jacobs met with Cox on July 15, 1982. (April 30, 2015 RT Vol. 2 at 48.)

Cox testified at the evidentiary hearing that when he was in jail in 1982, he did not initiate contact with law enforcement; law enforcement contacted him first. (April 23, 2015 RT at 14-15, 19.)  Cox testified that Mejia contacted him after he was moved from Petitioner's module, when he was placed in the "snitch" unit, also known as "canary row."  (Id. at 23.)  Prior to the evidentiary hearing, Cox had testified at a deposition in 2008 that Mejia initiated contact with him, and that he would go to see Petitioner and discuss Petitioner's case while the trial for Cox's robbery charge was pending. (Pet.'s Evid. H'g

---

[10]     Respondent concedes that Mejia wrote these notes. (Resp.'s Post-Evid. H'g Br. at 9.)

35

Ex. 118 (Cox Depo. at 12–17).)

In addition, Petitioner presented expert testimony at the evidentiary hearing from Alvin Henley and Alexandra Natapoff regarding the placement of prisoners at the Los Angeles County Jail during the time Petitioner was there.  Henley testified that Module 4400 was a Bloods gang module; Module 2700 was the "trustee" or disciplinary module; and Module 5900 was a "trustee" and recent bookings module.  (March 12, 2015 RT Vol. 1 at 216-17.)  Henley was part of "Liaison," who were "seasoned" officers and had the authority to place and move inmates; however, Operation Safe Streets (OSS), which was a unit of "rooky" deputies, worked within the jail and had similar authority.  (Id. at 217-18.)  Although Liaison officers were "routinely" requested to place prisoners next to a "friendly" (i.e., informant), the request was always flatly refused.  (Id. at 226-27.)  Nevertheless, a sheriff's deputy working at the jail could move an informant next to an inmate.  (Id.)  Although it was considered improper, it was not reported or considered to be misconduct.  (Id. at 241-42.)  In April 1982, there were not computerized records tracking the movement of inmates.  (Id. at 235-36.)  Henley did not remember Cox.  (Id. at 238.)

Alexandra Natapoff, a law professor at Loyola Law School, testified as an expert as to the use of jailhouse informants in Los Angeles County.  (March 12, 2015 RT Vol. 2 at 319-64.)  She opined that, given the sequence of events, Cox's movement into Petitioner's module represented a "classic example of Los Angeles jail practices" of placing informants next to prisoners for the purpose of obtaining a conviction.  (Id. at 325-26.)  She further stated that, between 1982 and 1985, the Los Angeles County District Attorney found 150 cases where an informant was placed next to an inmate and the informant testified against that inmate.  (Id. at 332.)  The defense bar found more than 200 such cases.  (Id. at 333.)  In addition, Natapoff testified that, during this time period, there was no mechanism for keeping records of the movements of inmates.  (Id. at 335.)

**4.      Analysis of Petitioner's Napue Claim based on a Massiah Violation**

Here, in order to resolve Petitioner's claim, the Court first determines whether there was a Massiah violation, and next, whether there was a Napue violation in connection with

36

the testimony offered by the prosecution at the pre-trial hearing on the admissibility of Cox's testimony.  As an initial matter, there is no dispute as to the threshold requirement of <u>Massiah</u> that Petitioner was in custody for a murder charge without counsel present at the time Cox engaged in conversation with Petitioner.

Thus, the Court must first determine under <u>Massiah</u>:  (1)  whether Cox was acting on behalf of the government when Petitioner told him about the Dunn murder; and (2) whether Cox deliberately elicited these statements from Petitioner.  <u>Randolph</u>, 380 F.3d at 1144. Mejia testified at trial that Cox contacted him first about providing information about the Dunn murder.  (RT at 6676.)  However, Cox's deposition testimony, Cox's July 31, 2001 Declaration, Cox's testimony in this case and other proceedings, and the evidentiary hearing testimony all suggest that it was Mejia who initiated contact with Cox.  (Pet.'s Evid. H'g Ex. 118 (Cox Depo.) at 1201; 2001 State Pet., Ex. 13 (Cox's July 31, 2001 Declaration); April 23, 2015 RT Vol. 1 at 14, 33-35); <u>see also</u> (MTE Ex. 4 at 293-94, 298 (RT in <u>People v. Thomas</u>, Case No. A382739 (Cox's testimony that Mejia came to visit him in the Los Angeles County Jail "two or three" times before Cox began providing Mejia with information and that Mejia suggested that Cox would get his "time cut" if he cooperated)); 1995 State Pet., Ex. 106 (Cox's testimony at the 1982 Whitfield preliminary hearing that the police "came to [him]" and he did not initiate contact with the police.[11])  Furthermore, the prosecution's own evidence indicates that Mejia met with Cox during a five-day period when Cox was housed in Module 2700, which occurred *prior* to Cox's move into Petitioner's module (Module 4400) on June 28, 1982, and *before* Cox obtained incriminating statements from Petitioner that Cox provided to law enforcement on July 15,

---

[11]   Petitioner also contends that Cox was already known to the Los Angeles Police Department and Los Angeles District Attorney as a "cooperator" and 89 Family Blood member, in view of the fact that Cox had previously testified at a preliminary hearing on September 14, 1981, as a victim in another gang shooting case that was prosecuted out of the LADA's Compton office and investigated by the LAPD. (Pet.'s Post H'g Br. at 6 (citing MTE, Ex. 3 (RT of Cox's testimony in the preliminary hearing in <u>People v. Garrett</u>, Case No. A621116)).)

1982.[12]    (Pet.'s Evid. H'g Ex. 86 (Mejia's notes reflecting meeting with Cox in Module 2700), Pet.'s Evid. H'g Ex. 86 (Jacobs's handwritten chart noting the module placement in the Los Angeles County Jail for certain inmates, including Cox and Petitioner, from May to September 1982); 1995 State Pet., Ex. 51, p. 216 and Pet.'s Evid. H'g Ex. 15 (February 18, 1983 affidavit to search warrant completed by Mejia stating that he spoke with Cox prior to the preliminary hearing); MTE Ex. 5 at 464, 467-68 (RT in People v. Boyd, Case No. A621116 (Ernest Cox's testimony that he was on the same row of Module 4400 as his brother Arthur, and that Arthur arrived in that module in July 1982, after being a trustee)); see also (March 12, 2015  RT Vol.1 at 235-36 (Henley's testimony that there were no computerized records tracking the movements of inmates in 1982 at the Los Angeles County Jail); (March 12, 2015 RT Vol. 2 at 335-38 (Natapoff's testimony that there were no records maintained by the Los Angeles County Jail of inmates' movements within the jail).)

Furthermore, as in Randolph, where the informant had hoped to receive leniency and provided useful testimony for which he later received leniency even though there was no express agreement between the informant and the government, Cox did the exact same thing in this case.  Mejia's notes (Pet.'s Evid. H'g Ex. 86) of his initial meeting with Cox in Module 2700 discuss others, such as Danny Horn, Craig Whitfield, and "Big Mike," but the notes do not discuss Petitioner; this further suggests that Cox was taking affirmative steps

---

[12]    The Court agrees that Cox's testimony at the evidentiary hearing as to his movements or discussions at the Los Angeles County Jail in 1982 was unreliable.  (Pet.'s Post H'g Br. at 10-11; Resp.'s Post-Evid. H'g Br. at 6 n.10.)  Cox acknowledged at the hearing that he has not "thought about this case in 30 years" and cannot accurately remember dates and times. (April 23, 2015 RT Vol. 1 at 16, 51.)  Cox's memory was also impacted by his alcohol and cocaine addictions, for which he was in rehabilitation several weeks before the evidentiary hearing. (Id. at 11-12.)  For instance, Cox testified that the first time he spoke with Mejia was when he was moved to "Canary Row" or the "snitch" module (Module 3300), and Cox remained there after speaking with Mejia. (Id. at 26-28, 29, 62.)  This is at odds with the statements Cox made in his July 15, 1982 recorded statement, as well as Jacobs's chart. (Pet.'s Evid. H'g Exs. 86, 104.)

In addition, in view of Cox's July 15, 1982 recorded statement, the testimony at trial, Jacobs's testimony at the evidentiary hearing, and Jacobs's module chart, it appears Cox spoke with law enforcement before he was transferred to the "snitch" module (Module 3300) in September 1982.

to cooperate with the prosecution after he was placed in Module 4400. Although Respondent maintains that "agency" with Cox cannot be established because there is no direct evidence showing that members of the prosecution team instructed Cox in any way to gather evidence from Petitioner (Resp.'s Post-Evid. Hr'g Br. at 4-5), Respondent fails to acknowledge or address the authority holding that no such direct evidence is necessary to prove a Massiah violation. Thus, as in Randolph, because there is sufficient evidence to show that "the State made a conscious decision to obtain [the informant's] cooperation and that [the informant] consciously decided to provide that cooperation," Cox was acting an agent of the prosecution when he spoke to Petitioner in Module 4400.

In addition, there is ample evidence, including the evidence presented by the experts at the evidentiary hearing, suggesting that the practice of misusing informants was widespread during the period of June to September 1982 when Cox was meeting with law enforcement to negotiate a deal in exchange for his testimony against Petitioner. Indeed, as Jacobs himself conceded at the evidentiary hearing, the movement of Cox in June 1982 from Module 2700 to Module 4400 -- where Petitioner was located -- was questionable. (April 30, 2015 RT Vol. at 66-67.) It is difficult to believe that Cox's move to Petitioner's module within at most a few days after Cox met with Mejia and nearly three months after Cox was incarcerated for his robbery charge was purely coincidental.[13] See also Henry, 447 U.S. at 271 ("Even if the [government] agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result.") There also is evidence reflecting negatively on the credibility of Mejia, who primarily worked with Cox to obtain his testimony in this case. The Court is aware of one instance where Mejia was found to

---

[13]    In view of the testimony provided by the experts, there is ample pattern and practice evidence suggesting that the abuse of informants that Petitioner alleges here was occurring during the time period at issue. By way of background, it is worth further noting that Mejia was a member of the Community Resources Against Street Hoodlums (CRASH) unit, an anti-gang unit within the Los Angeles Police Department found to have engaged in a pattern and practice of improper investigative tactics. See United States v. City of Los Angeles, California, 288 F.3d 391 (9th Cir. 2002).

have lied in connection with an official investigation in an attempt to avoid being reprimanded.[14] Although Jacobs's testimony was credible that he neither requested or knew of any request to move Cox from Module 2700 into Module 4400 next to Petitioner, the evidence points to the conclusion that Mejia had a hand in that move.

Moreover, as in <u>Randolph</u>, where the Ninth Circuit found that informant deliberately elicited evidence by simply "being friendly and talkative," Cox was a fellow gang member from Petitioner's neighborhood.  Thus, Cox already was in a position of confidence when he joined Petitioner in Module 4400, such that Petitioner felt comfortable sharing the details of the crime with which he had been charged.  <u>See</u> <u>Henry</u>, 447 U.S. at 273 ("When the accused is in the company of a fellow inmate who is acting by prearrangement as a Government agent, . . . [c]onversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents.").   Accordingly, there is evidence sufficient to establish that the prosecution placed Cox next to Petitioner for the purpose of obtaining incriminating statements and Cox deliberately elicited these statements from Petitioner in violation of <u>Massiah</u>.

Next, in order to prove a <u>Napue</u> violation in connection with the testimony offered by the prosecution at the pre-trial hearing on the admissibility of Cox's statements, Petitioner must demonstrate that the prosecution elicited testimony that was actually false and knew or should have known that the testimony was false.  Given the Court's analysis that a <u>Massiah</u> violation occurred, the first prong under <u>Napue</u> that the prosecution presented testimony that was "actually false" at the pre-trial hearing is met.  As the Court



14

found above, Mejia's testimony that he met with Cox after Cox initially contacted him and after Cox had already been moved into Petitioner's module (Module 4400) was not true. Moreover, the trial court relied upon this testimony in denying the motion, as it proved the absence of a <u>Massiah</u> violation.

Furthermore, because the prosecutor is responsible for investigating representations made by members of the prosecution team, including law enforcement officers, the second prong under <u>Napue</u> is met.  <u>Jackson</u>, 513 F.3d at 1071 (rejecting the State's argument that there was no <u>Napue</u> violation where the prosecutor himself did not know of the informant's perjury and finding that the prosecutor "should have known" of the false testimony under <u>Giglio</u>'s requirement to know of all promises made by the police, who are "spokespersons for the government"); <u>Lisker v. Knowles</u>, 651 F. Supp. 2d 1097, 1138-39 (C.D. Cal. 2009) (finding <u>Napue</u> violation despite prosecutor's personal ignorance of the falsity of the evidence, stating, "[w]here the prosecutor's investigator has the responsibility for the integrity of the State's evidence, it cannot be the case that the prosecutor's technical ignorance of the falsity of that evidence insulates the proceedings against a due process violation."); <u>Mastroacchio v. Vose</u>, 274 F.3d 590, 600 (1st Cir. 2001) ("[A]s a legal matter, the Supreme Court precedent on this issue is clear.  When any member of the prosecution team has information in his possession that is favorable to the defense, that information is imputable to the prosecutor.").  Thus, in view of Mejia's false testimony presented at the pre-trial hearing, the prosecutor (both Trutanich and Jacobs) should have known that the testimony was "actually false."[15]

Nevertheless, because materiality under <u>Napue</u> must be considered cumulatively with

[15]  Notwithstanding the law that imputes knowledge of Mejia's false statements at the <u>Massiah</u> hearing to Trutanich, Trutanich himself testified that he reviewed the murder book and prosecution file which contained Mejia's notes evidencing his meeting with Cox in Module 2700 (Pet.'s Evid. H'g Ex. 86) and the module chart prepared by Jacobs showing that Cox was in Module 2700 from June 22 through 27, 1982 (Pet.'s Evid. H'g Ex. 86).  (April 30, 2015 RT Vol. 1 at 117, 129-30; April 30, 2015 RT Vol. 3 at 174-76.)  In addition, Trutanich testified that he would have read Mejia's sworn affidavit regarding the timing of his first meeting with Cox prior to the <u>Massiah</u> hearing.  (April 30, 2015 RT Vol. 3 at 43-44.)

41

other <u>Napue</u> and <u>Brady</u> claims, the Court will reserve judgment as to whether relief should be granted as to Claim 5(C) after reviewing all of Petitioner's prosecutorial misconduct claims.  <u>Jackson</u>, 513 F.3d at 1071; <u>Kyles</u>, 514 U.S. at 436 n.10.

###### D.    **Brady Claims pertaining to Cox**

Here, for the reasons set forth above, the Court finds that Petitioner cannot demonstrate a violation of <u>Brady</u> in connection with his allegations pertaining to Cox. There was no evidence elicited at the evidentiary hearing that established that Cox received additional benefits from the prosecution in terms of making promises in connection with the Billingsley murder or his marijuana violation.   Furthermore, there was no evidence supporting Petitioner's allegations that Cox was "coached" by the prosecution. Accordingly, no relief is warranted as to the allegations that the prosecution withheld material information pertaining Cox's testimony.

#### V.    **Prosecutorial Misconduct Claims in connection with Lewis's Testimony**

###### A.    **Factual Background of Petitioner's Napue Claim based on Lewis's Testimony**

In the December 10, 2013 Order, the Court granted an evidentiary hearing based on Petitioner's <u>Napue</u> allegations pertaining to Lewis's testimony regarding the identity of the woman in the car with her on the night of the murder. (December 10, 2013 Order at 21-23.)

At the preliminary hearing, Lewis testified that the driver of the car wished to remain unknown, and that she lived "a pretty good ways out." (CT at 17-18, 21.)  At trial, Lewis testified that the car was being driven by "Jean Rivers," a woman who Lewis only had known for approximately a month before the shooting and had not seen since the murder. (RT at 7695-96, 7735-77.)  Trutanich told the jury that the prosecution had attempted to locate this driver, but was unable to do so. (RT at 6847.)  However, the true identity of the driver of the car was Arlene McKay, not Jean Rivers; Lewis knew McKay and where she lived and, like Lewis, McKay was a member of the Eastern Stars. (1995 State Pet., Ex. 136.)  Furthermore, evidence obtained from the prosecution's file indicated that the

prosecution might have been aware of McKay's identity, address, and her telephone number before Petitioner's trial. (1995 State Pet., Ex. 136 ("witness information provided by Joe Lewis, Arlene McKay – lives around 41st Pl. and Figueroa, is a member of S. Eastern Star"); 1995 State Pet., Ex. 143 ("Arlene McKay: 750-5867   1126 W. 75th Street")).)

Prior to the evidentiary hearing, Petitioner presented the following evidence in support of this claim:  (1) a witness subpoena directed to Arlene McKay at 41st Pl. and Figueroa (Pet.'s Evid. H'g Ex. 39); (2) notes identified by Chrisman as Mejia's handwriting referencing "Arlene McKay aka Jane Rivers," "41st and Figueroa." and "Pastor R. Kelly, St. Anthony Grand Lodge, 232-9865" (Pet.'s Evid. H'g Ex. 33; Pet.'s Evid. H'g Ex. 4 (Chrisman Report)); (3) telephone messages for Jacobs from Lewis with a note as to Arlene McKay under Kenneth Hayes on the back of one of three memo pads (Pet.'s Evid. H'g Ex. 72); (4) Trutanich's handwritten notes on a page of yellow legal pad written in black ink listing witness and noting, "Passenger in Lewis car 'Arlene McKay' 'Jean Rivers,'" with the entry crossed out in blue ink (Pet.'s Evid. H'g Ex. 68); (5) Trutanich's notes identifying Arlene McKay under "things to do" (Pet.'s Evid. H'g Ex. 52); (6) handwritten note with Arlene McKay on it (Ex. 54); (7) handwritten note with Kenneth Hayes and Arlene McKay (Pet.'s Evid. H'g Ex. 74); (8) handwritten note (partly legible) with "Dunn Homicide" written at the top and listing Patricia Lewis, Arthur Cox, and Arlene McKay (with "___ Jane R___" next to her name) and with contact information: "St. Anthony Grand Lodge, 4126 So. Figueroa" (Pet.'s Evid. H'g Ex. 83); (9) handwritten note with "Dunn Homicide" written at the top, noting "'wit info given by wit Joe Lewis" and noting "Arlene McKay - lives around 41st & Figueroa, is a member of S. Eastern Star, St. Anthony Grand Lodge 232-9865, Mr. Bobby Kelly, 582-6919" (Pet.'s Evid. H'g Ex. 84); (10) handwritten note listing Arlene McKay and Patricia Lewis with Lewis's contact information (Pet.'s Evid. H'g Ex. 85); (11) notes identified by Chrisman as Mejia's handwriting listing Arlene McKay with address 1126 W. 75th Str., 750-5867 and November 21, 1995 memorandum from Mark Silverstein (ACLU) noting that they did not receive a copy of this page because it was on

the back of one of the pages in the murder book (Pet.'s Evid. H'g Ex. 87; Pet.'s Evid. H'g Ex. 4 (Chrisman Report)); and (12) Arlene McKay's death certificate listing 1126 W. 75th Street as her home address (Pet.'s Evid. H'g Ex. 103).

In addition, Trutanich testified at the evidentiary hearing regarding the evidence he provided to defense counsel about the trial witnesses. (RT at April 30, 2015 RT Vol. 3 at 18 (stating that "I went beyond Brady").) Trutanich testified that the handwritten list of witnesses, including a reference to "Passenger in Lewis car 'Arlene McKay' 'Jean Rivers'" that was crossed out in blue ink (Pet.'s Evid. H'g Ex. 68), was his handwritten pre-trial witness list. (April 30, 2015 RT Vol. 2 at 10-11.) Trutanich further testified that he was not able to serve this witness with a trial subpoena because he could not locate her. (Id.) Nevertheless, Trutanich testified that the trial subpoena, which listed Arlene McKay's name and the address of 41st Place and Figueroa, was given to the defense. (April 30, 2015 Vol. 1 at 192-95 and Pet.'s Evid. H'g Ex. 39.) However, at the deposition of Bernard Gross, Petitioner's trial counsel who is now deceased, Gross testified that he was not aware at the time of trial that the second eyewitness was also known as Arlene McKay or where she lived. (Pet.'s Evid. H'g Ex. 117 at 13-16.[16])

---

[16]   At his deposition, Gross was questioned regarding his cross-examination of Lewis at the preliminary hearing and trial, and he answered:

A:        [E]very answer was negative. Didn't know, didn't remember, and had no idea where she was. I asked her where she was picked up, she didn't know. Did she know the name, no. She knew nothing whatsoever, completely. And I asked her question after question, and it was negative all the way that she didn't know anything or anybody, the name of the other person in the vehicle that was with Mrs. Lewis.

                    *        *        *

[W]e would have checked out the name, the address and the location of the lady that was with Mrs. Lewis at the time of the alleged murder. You don't have to be a genius to know

44

Following the evidentiary hearing, the Court inspected the original murder book in this case,[17] and determined that the information contained in Petitioner's Evidentiary Hearing Exhibit 87 (Mejia's notes listing Arlene McKay's correct address) was on the back of Petitioner's Evidentiary Hearing Exhibits 33 and 83 (Mejia's notes listing "Arlene McKay aka Jane Rivers" at 41st and Figueroa). The murder book contained the original version of Petitioner's Evidentiary Hearing Exhibits 33, 83, 84, 85, and 87. The Court also inspected the original set of copies of all pre-trial discovery provided by the prosecution to trial counsel following the evidentiary hearing.

### B.   Analysis of Petitioner's Napue Claim Based on Patricia Lewis's Testimony

Here, there is no dispute as to the first prong of <u>Napue</u>: Lewis's testimony that "Jean Rivers" was the driver of the car was untrue. The Los Angeles County death certificate confirms that this woman's name was Arlene McKay, and it lists her address as the same home address noted in Mejia's notes for this woman that were contained in the murder book. (Pet.'s Evid. H'g Exs. 87, 103.) Other evidence in this case suggests that McKay was a friend of Lewis and Lewis lied in order to protect her friend because McKay was afraid and did not want to get involved as a witness. (<u>See</u> 1995 State Pet., Ex. 186 (Decl. of James Lewis at ¶ 19 (stating that he was Patricia's stepson and noting that, after hearing shots in the neighborhood on the day of the Dunn murder, his stepmother returned home in a car driven by her friend, Arlene McKay, who also was a member of the Eastern Star).). Thus, Lewis's testimony on this point was "actually false" within the meaning of <u>Napue</u>.

Next, under <u>Napue</u>, Petitioner must show that the prosecution knew or should have

_____

that.   It's common sense.

(Pet.'s Evid. H'g Ex. 117 at 14, 16.)

[17]     The "murder book" was a binder that the prosecution routinely used in murder cases to prepare for trial, and contained relevant documents, such as police reports, photographs, Dunn's autopsy, and handwritten investigative notes.

known that Lewis's testimony was actually false.  <u>Hayes</u>, 399 F.3d at 984.  Respondent argues that Trutanich did not know that Lewis's testimony as to the identity of the driver of the station wagon was false and, regardless, the prosecution had provided evidence of the alternate identity of this witness through pre-trial discovery such that defense counsel should have been aware of her identity.  (<u>See</u> Resp.'s Post-H'g Br. at 22-25.)  Nevertheless, both the record at trial and trial counsel's deposition testimony show that trial counsel did not know that the second eyewitness might also be known as Arlene McKay or where this woman lived.  (<u>See</u> RT at 7735-77; Pet.'s Evid. H'g Ex. 117 (Gross Depo. at 13-16).)  At trial, trial counsel questioned Lewis extensively about the identity of her friend, and asked a series of questions designed to elicit information that would enable counsel to locate Rivers.  (RT at 7735-77.)  For instance, counsel asked Lewis:  how Lewis met Rivers; whether she had seen or spoken with Rivers since the murder; whether Lewis knew where Rivers lived; and what sort of an automobile Rivers drove.  (<u>Id.</u> at 7735-40.)  Furthermore, despite Trutanich's assertion at the evidentiary hearing that McKay's subpoena would have been sent to the defense, the subpoena does not indicate, by an "aka" or otherwise, that McKay was the same person as Rivers, and it does not list her correct home address.

The Court's review of the original pre-trial discovery provided by the prosecution to trial counsel confirms that the prosecution did not provide to the defense copies of the notes pertaining to McKay and/or Rivers that were contained in the murder book, or any other information indicating that McKay was the same person as Rivers or her correct address. In fact, in state habeas proceedings, Petitioner explained that the prosecution's notes pertaining to Arlene McKay and Jean Rivers and identifying them as the same person were disclosed for the first time during informal discovery when Mark Silverstein, Petitioner's state habeas counsel at the ACLU, inspected the original murder book.[18]  In sum, the evidence demonstrates that the prosecution failed in its constitutional obligation under

---

[18]      Specifically, Silverstein found the page of notes referring to "Arlene McKay aka Jane Rivers." (August 15, 1997 Pet.'s Reply to Inf. Response at 17-18; <u>see also</u> Pet.'s Evid. H'g Ex. 83.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Brady to provide the defense information showing that the true identity of Jean Rivers was Arlene McKay, as well as Arlene McKay's correct home address.  Strickler, 527 U.S. at 281-82 (finding that Brady is violated where evidence that is impeaching is suppressed by the State, "either wilfully or inadvertently").

Despite the fact that trial counsel indicated no knowledge that "Jean Rivers" might not be the name of this second eyewitness, at no point did Trutanich make clear for the record during trial that "Jean Rivers" was also known as "Arlene McKay."  At the evidentiary hearing, Trutanich agreed that his handwritten notes on a page from a yellow legal pad noting "Passenger in Lewis car 'Arlene McKay'  'Jean Rivers'" was likely a witness list he had made to prepare for trial.  (April 30, 2015 RT Vol. 2 at 10-11, Pet.'s Evid. H'g Ex. 68.)  Indeed, the use of quotes around both names in his notes suggest that Trutanich questioned the identity of this witness, and that he had some idea that Lewis was not being truthful about the name of the driver.  As a matter of fact, Trutanich testified at the evidentiary hearing, as Respondent concedes, that he was not certain which was the correct name (i.e., Rivers or McKay) for the driver in the car.  (See Resp.'s Post-Evid. H'g Br. at 23 (citing April 30, 2015 RT Vol. 3 at 23, 29-30, 33).[19])  Respondent also concedes that Trutanich at a minimum "suspected" that the driver's name was McKay.  (Resp.'s Post Evid. H'g Br. at 24.)  See also Morris v. Ylst, 447 F.3d 735, 744 (9th Cir. 2006) (holding that a prosecutor must investigate perjured testimony and may not avoid the obligation to do so by "remaining willfully ignorant of the facts.") (citations omitted).  Furthermore, Mejia's notes in the murder book containing McKay's correct address (Pet.'s Evid. H'g Ex. 87) indicate that Mejia knew who McKay was and that he likely would have interviewed

---

[19]     To the extent that Respondent maintains that Trutanich was not certain there was a second eyewitness in the car based on portions of Trutanich's evidentiary hearing testimony (Resp.'s Post-H'g Br. at 23 (citing April 30, 2015 RT Vol.3 at 27-28, 33)), his argument is disingenuous.  Ample evidence demonstrated that Lewis was a passenger in the station wagon, not the driver, including trial testimony which Trutanich himself elicited.  (See RT at 7695-97.)  Thus, there is no credible evidence that Trutanich questioned the existence of a second eyewitness.

her about the evening of the Dunn murder.[20]   Thus, under <u>Napue</u>'s second prong, the evidence, including Trutanich's own handwritten pre-trial witness list, demonstrates that the prosecution either knew or at least should have known that Lewis's testimony as to identity of the woman in the car with her on the night of the murder was actually false. Consequently, even if Trutanich's assertion at trial was true that he was unable to locate the second eyewitness, Trutanich was constitutionally obligated to make clear for the record when Lewis was testifying that the second eyewitness was also known as Arlene McKay.

Lastly, Petitioner must show that Lewis's false testimony on this point was "material." <u>Hayes</u>, 399 F.3d at 984.  By the time of the evidentiary hearing -- more than 30 years after the trial  -- both McKay and Mejia, the primary investigating officer, had passed away.  Trutanich's detective, Bell, claimed not to remember this witness or much of the investigation at all at this juncture. (April 30, 2015 RT Vol. 3 at 49, 52.) The sole evidence elicited by Petitioner as to these allegations was the crime scene reconstruction.[21]  However, this evidence fails to confirm that McKay's accounts of the events on the evening of the murder would have differed with the account offered by Lewis.  Indeed, similar evidence was presented at trial, when Lewis was cross-examined with a diagram regarding the placement of the vehicles and about the rainy conditions of the evening of the murder

---

[20]     Significantly, Petitioner correctly points out that Trutanich indicated that this witness was important and stated that he had two investigators trying to find her.  (Pet.'s Reply at 14 (citing April 30, 2015 RT Vol. 1 at 210-12.)  In addition, Petitioner points to the Lewis's 2008 declaration, in which she states that McKay was interviewed by the police. (Pet.'s Post H'g Br. at 28 n.9 (citing Mot. For Evid. H'g, Ex. 1328).)  Respondent contends that this statement is hearsay. (Resp.'s Post-Evid. H'g Br.  at 26 n.30.)  Regardless, whether or not Mejia or any other member of the prosecution team interviewed McKay does not change the outcome of this claim; there is ample evidence indicating that the prosecution knew or should have known that Lewis's testimony regarding the identity of the driver was false, as discussed above.

[21]     At the evidentiary hearing, Petitioner elicited expert evidence from Robert Snook, as well as John Hammond, an investigator with the FPD, regarding a crime scene reconstruction filmed on March 25, 2014, during the hours around 6:30 in the evening -- the same date and time that the Dunn murder in 1982. (March 12, 2015 RT Vol. 1 at 131-33.) The Court also viewed the videotape of Snook's crime scene reconstruction. (<u>Id.</u> at 133.)

occurred that could have affected her ability to see the crime. (RT at 7737-38 (Lewis's testimony on cross-examination that it was "misting" at the time the crime occurred); RT at 7742-43 (Lewis's testimony on cross-examination that it was "getting pretty dark" at the time the crime occurred), RT at 7749-70 (Lewis's cross-examination regarding the position of automobiles and Dunn based on a diagram).)

Nevertheless, the Court recognizes that Petitioner is not responsible for his inability to elicit any testimony as to what McKay witnessed on this evening by the time he was given the chance to do so. Instead, Petitioner's inability to elicit this evidence resulted from a combination of factors beyond his control: the prosecutor's inadvertent failure to provide trial counsel sufficient information to identify the driver as Arlene McKay and her whereabouts at the time of trial; the prosecutor's knowing failure to correct Lewis's testimony regarding the identity of the driver at trial; and the California Supreme Court's error in failing to grant record expansion and/or an evidentiary hearing as to this claim on habeas review more than a decade ago. Especially in view of his pre-trial witness notes, Trutanich's failure at trial to point out for the record during Lewis's testimony that the alternate identity of "Jean Rivers" was Arlene McKay was deeply troubling. However, the California Supreme Court's summary denial of Petitioner's allegations given the evidence that was presented to it in state habeas proceedings was inexplicable. As it did in this case, the California Supreme Court routinely summarily denies state habeas petitions in capital cases.[22] Yet, the federal courts grant habeas relief in California capital cases in well over

---

[22]

See CALIFORNIA COMMISSION ON THE FAIR ADMINISTRATION OF JUSTICE, REPORT AND RECOMMENDATIONS ON THE ADMINISTRATION OF THE DEATH PENALTY IN CALIFORNIA (2008) (CCFAJRRADPCA), http://www.ccfaj.org/documents/reports/dp/official/FINAL%20REPORT%20DEATH%20PENALTY.pdf at 90 n.118 ("The California Supreme Court issues an order to show cause requiring the Attorney General to respond in *only 8% of death penalty habeas corpus petitions*, and orders an evidentiary hearing before a referee *in only 4.5%* of the cases.") (emphasis added).

half the cases they review.[23]  Nevertheless, by the time a California capital case reaches the federal courts in habeas proceedings, often decades have passed and critical evidence is no longer available.[24]

In this case, whether relief is warranted hinges upon the definition of "materiality" under Napue.  It is well-established that a Napue violation is "material" and results in the reversal of a conviction "if the false testimony could in any reasonable likelihood have affected the judgment of the jury." Dow v. Virga, 729 F.3d 1041, 1047 (9th Cir. 2013) (citing Napue, 360 U.S. at 271; and Giglio v. United States, 405 U.S. 150, 153 (1972)).  See also Jackson, 513 F.3d at 1076; Hayes, 399 F.3d at 984.

Although the government's knowing use of false testimony does not per se require reversal, the Napue materiality standard is "less demanding" than "ordinary" harmless error review.  See Dow, 729 F.3d at 1048 (citations omitted).  A Napue violation is established

---

[23]   Jones v. Chappell, 31 F. Supp. 2d 1050, 1055 (C. D. Cal. 2014), rev'd, 806 F.3d 538 (9th Cir. 2015) (noting that, between 1978 and 1997, "*60 percent* of all inmates whose habeas claims have been finally evaluated by the federal courts [] *were each granted relief from the death sentence by the federal courts*.") (citing statistics from Cal. Dep't of Justice, Criminal Justice Statistics Center, Homicide in CA, http://oag.ca.gov/sites/all/files/agweb/pdfs/cjsc/publications/homicide/hm11.pdf ) (emphasis added); CCFAJRRADPCA at 4 (noting that, in cases where federal courts have rendered final judgments in habeas corpus challenges to California death penalty judgments for the period from 1977 to 2008, *federal courts have recommended relief in the form of a new guilt or penalty phase trial in 38 cases, or 70 percent* of those cases) (emphasis added).

[24]   See also, e.g., Jones, 31 F. Supp. 2d at 1055 (noting that, "[f]or those whose challenge to the State's death sentence is ultimately denied at each level of review, the process will likely take 25 years or more.") (citing Gerald Uelmen, *Death Penalty Appeals and Habeas Proceedings: The California Experience*, 93 Marq. L. Rev. 495, 496 (2009) ("Typically, the lapse of time between sentence and execution is twenty-five years, twice the national average, and is growing wider each year.").

In addition, the time for a capital case to proceed through the California state court system ranges between 14.7 and 19.17 years.  CCFAJRRADPCA at 22-24.  Although federal courts have an average delay of 8.4 years from the filing of a habeas petition to the grant or denial of petition, including appeals, "[m]uch of this delay is attributable to the absence of a published opinion and/or an evidentiary hearing in state courts."  Id. at 24.

where there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." Jackson, 513 F.3d at 1076 (quoting Hayes, 399 F.3d at 985) (emphasis added in Jackson). Moreover, "Napue requires us to determine only whether the error *could* have affected the judgment of the jury, whereas ordinary harmless error review requires us to determine whether the error *would* have done so." Dow, 729 F.3d at 1048 (emphasis in original). Cf. Brecht v. Abrahamson, 507 U.S. 619, 636-37 (1993) (holding that federal habeas review requires higher standard of harmless error than "beyond a reasonable doubt" standard used on direct review; and holding that, on federal habeas review, standard of whether error "had substantial and injurious effect or influence in determining the jury's verdict" applies). Where a Napue error is deemed to be material, the analysis ends; there is no further harmless error analysis under Brecht. Hayes, 399 F.3d at 984.

Furthermore, in discussing materiality under Napue, the Ninth Circuit has "gone so far as to say that 'if it is established that the government knowingly permitted the introduction of false testimony, reversal is *virtually automatic.*'" Jackson, 513 F.3d at 1076 (quoting Hayes, 399 F.3d at 978) (emphasis added). Thus, the question of materiality is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a "*verdict worthy of confidence*." Hayes, 399 F.3d at 984 (citations omitted) (emphasis added).

Here, the false testimony regarding the true identity of the second eyewitness directly impacted the fairness of Petitioner's trial, and now casts grave doubt on whether the verdict can be viewed as "worthy of confidence" given the evidence presented to this Court. Even according to Trutanich, Lewis's testimony was the lynchpin of the case. (See Pet.'s Mot. For Evid. Hr'g, Ex. 1323 (Trutanich Depo.) at 61, 71 (stating that Lewis was "remarkable"; given her testimony, the only way to lose the case was through "bad lawyering"; and her testimony was "riveting.") By presenting evidence as to the identity and whereabouts of the

51

second eyewitness that the prosecution knew or should have known was false, the State effectively forever precluded Petitioner from being able to find out with certainty what McKay saw on the night of the Dunn murder.

To assess the materiality of this error, the Court must consider the range of possible impacts on the jury if Trutanich had pointed out Lewis's false testimony regarding the identity and whereabouts of the driver after Lewis testified. It is possible, as Respondent suggests, that the jury would have thought only that Lewis was lying in order to protect her friend. Nevertheless, it is also possible that the jury could have formed a negative impression of Lewis's credibility. Moreover, the jury already had been made aware that Lewis had testified inconsistently regarding a key fact: the identity of the shooter. At trial, Lewis explained that she failed to identify Petitioner as the shooter at the preliminary hearing because she was scared after her home was attacked with gunfire. However, if the jurors had known that Lewis not only had testified inconsistently about the identity of the shooter but also had testified falsely about the identity of the driver of the station wagon, the jurors would have been more inclined to distrust Lewis's testimony. In fact, the jury was instructed to discount Lewis's testimony if she perjured herself on key facts. (CT at 665; RT at 8400 ("A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point"); see also Silva v. Brown, 416 F.3d 980, 987 (9th Cir. 2005) ("Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case."); Carriger v. Stewart, 132 F.3d 463, 480 (9th Cir. 1997) (holding that impeachment evidence was material when it pertained to the "prosecution's star witness"); United States v. Jernigan, 492 F.3d 1050, 1055-56 (9th Cir. 2007) (holding that prejudice is particularly strong when a falsehood undermines the only testifying eyewitness); Hayes, 399 F.3d at 986 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in

testifying falsely that a defendant's life or liberty may depend.").

Furthermore, if Trutanich had pointed out Lewis's false testimony and thereby caused the jury to discredit Lewis's trial testimony, the jury might not have believed that Petitioner was in fact the actual shooter. Indeed, the account given by Hayes that the jury heard, through the testimony of both Hayes and Officer Jones, suggests that the passenger in the van with Petitioner -- Curtis Thomas (aka Bongo) -- was the shooter. This is also consistent with the testimony Lewis initially provided at the preliminary hearing when she testified that she did not see whose arm came out of the window with the gun that shot Dunn, which she later contradicted in her trial testimony identifying Petitioner as the shooter.

The only other evidence suggesting that Petitioner was the shooter was the dubious testimony provided by Gardner, a career informant whose credibility was greatly damaged on cross-examination. Although Gardner had worked as an informant for Holmes for three years and had provided information on 25 other crimes, it was three years after the Dunn murder before Gardner told Holmes about Petitioner's statements about the Dunn murder. (April 30, 2015 RT Vol. 3 at 80, 87.) Considering that Gardner was a seasoned "snitch" with an obvious self-serving motive to testify, as well as the length of time that elapsed between the Dunn murder and the time Gardner provided Petitioner's incriminating statements to the prosecution, it is doubtful that the jury gave his testimony much weight. See, e.g., Lisker, 651 F. Supp. 2d at 1140 (granting relief pursuant to Napue where the remaining evidence, which consisted of the testimony of an informant with an "obvious motive to fabricate the confession [such] that its value was minimal," left the court with "no confidence in the jury verdict" rendered against the petitioner).

Consequently, if the jury had believed that Thomas was the shooter instead of Petitioner, the jury only could have convicted Petitioner of first degree murder under an aider and abetter theory of liability. At trial, the jury was instructed on aiding and abetting, as follows:

A person aids and abets the commission of a crime when he or she, with

knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense by act or advice aids, promotes, encourages or instigates the commission of the crime.

A person who aids and abets the commission of a crime need not be personally present at the scene of the crime.

Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.

Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.

(RT at 8313-14, see also CT at 681, 682.)   Given that Cox's testimony implicating Petitioner in the Dunn murder (i.e., Petitioner told Cox that he had told Thomas to shoot Dunn) and implicating Petitioner in shooting Lewis's home was procured by a violation of Massiah, its presentation to the jury was error and the jury should have been instructed to disregard it entirely.  Accordingly, assuming that the jury believed Thomas was the shooter, there would have been no admissible evidence suggesting that Petitioner had the specific intent necessary under these instructions to convict him of first degree murder under an aider and abetter theory of liability.[25]  Thus, there is a reasonable likelihood that the jury would not have convicted Petitioner of first degree murder at the guilt phase.  Moreover, even if the jury in this scenario somehow still found Petitioner guilty of first degree murder at the guilt phase, it seems impossible that the jury would have imposed the death penalty upon Petitioner at the penalty phase if they believed that Thomas was the actual shooter.

In addition, if Trutanich had corrected Lewis's testimony regarding the identity of the driver, counsel could have had a chance to subpoena McKay as a witness at trial.  It is possible that McKay could have testified consistently with Lewis as to the events of the

---

[25]   Although Lewis also testified that she heard the driver of the van (Petitioner) say "Let's go f___ him up" when Dunn first rode by the van on his bicycle and before the van stopped, such words by themselves did not constitute an action by Petitioner that would have "instigated" or "encouraged" Thomas to go as far as to murder Dunn.  In any case, especially given Lewis's prior inconsistent about the identity of the shooter, Lewis's testimony on other material facts would have been far less persuasive if the jury had also known about her false testimony regarding the identity of the driver of the station wagon.

evening and the identity of the shooter.  Indeed, Respondent argues that "any trial testimony by McKay would have only served to corroborate the particulars of Lewis's testimony, not undermine it."  (Resp. Post-H'g Br. at 26-27.)  This argument, however, begs the question as to why the prosecution did not present McKay as a witness if in fact her testimony was helpful.  The testimony of two eyewitnesses who corroborate each other is obviously better than testimony from only one eyewitness.  Thus, Petitioner's response -- that the answer to this question is that McKay's testimony was not helpful to the prosecution -- is a reasonable conclusion.

It is also possible that McKay could have testified that it was so dark and rainy that it was impossible to see the driver's face, as the reconstruction evidence suggested.  Had she done so, McKay's testimony could have further undercut Lewis's testimony identifying Petitioner as the shooter to the extent that the jury would have had more reason to doubt Lewis on that point.  See, e.g., Napue, 360 U.S. at 269 ("It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt.").  McKay's testimony could have also bolstered Petitioner's alibi defense at trial and the evidence he presented at trial that he was not in the van on the night of the murder.  Thus, under these alternate scenarios, there is a reasonable likelihood that the jury would not have convicted Petitioner of the first degree murder of Dunn or that the jury would not have imposed the death penalty upon him.

## C.   Collective Impact of Napue and Brady Violations

As a next step, the Court must consider the Napue violation based on Lewis's false testimony regarding the second eyewitness collectively with the Napue violation based on the false testimony presented by the prosecution at the pre-trial hearing regarding the admissibility of Cox's testimony.  See Jackson, 513 F.3d at 1076.  While Lewis's testimony was the most important testimony in this case, Cox's testimony was the next most important testimony; it corroborated Lewis's testimony that Petitioner was responsible for the Dunn murder and demonstrated that Petitioner was responsible for shooting Lewis's home.  Indeed, as Trutanich stated at the pre-trial hearing on Cox's testimony:

55

1    . . . Mr. Cox's evidence ties into [] Patricia Lewis's statement in that her
2    house was shot.  It ties in with the 89 Family Bloods.  It ties into a gang search
     warrant.  Mr. Cox's statement is the underlining corroboration of every piece
3    of evidence that we will produce in this trial other than the eyewitness herself
     Patricia Lewis.

4    (RT at 6590.)

5           Moreover, after excluding Cox's testimony pursuant to a Massiah violation, the only

6    other testimony as to Petitioner's responsibility for the Dunn murder was provided by

7    Gardner, whose testimony was probably of little value to the jury.  See Lisker, 651 F. Supp.

8    2d at 1140.  Thus, in view of the false testimony offered by Lewis and members of the

9    prosecution team pertaining to Cox which led to the improper admission of Cox's testimony

10   in violation of Massiah, the collective error was substantial and leaves this Court with no

11   confidence in the jury's verdict.[26]  See also Hayes, 399 F.3d at 978 ("Deliberate deception

12   of a judge and jury is 'inconsistent with the rudimentary demands of justice'") (quoting

13   Mooney v. Holohan, 294 U.S. 103, 122 (1935)).

14          Furthermore, the devastating impact of collective error becomes clearer by imagining

15   what the jury would have thought if Trutanich would have pointed out the false testimony

16   provided by Lewis and the incorrect testimony provided by Judge Shook, and if the jury had

17   been instructed to completely disregard the testimony of Cox after these witnesses testified

18   at the trial.  If Trutanich had done so in accordance with his constitutional duty, the jury

19   likely would have had rejected the credibility of the prosecution's entire case against

20   Petitioner.  See Hayes, 399 F.3d at 988 (finding materiality of a Napue error pertaining to

21   an informant's secret deal which, if had been disclosed to the jury by the prosecutor after

22   the informant testified, "would have had a devastating effect on the credibility of the entire

23   prosecution case."); Sivak, 658 F. Supp. at 916 (quoting Jackson, 513 F.3d at 1077) (noting

24

25          [26] However, as noted above, the impact of the Napue error resulting from Judge Shook's
26   testimony would have been minimal in view of the fact that Judge Thomas testified similarly regarding
     Cox's marijuana violation at the Green Meadows trial the year before, and does not show that the
27   prosecution offered Cox an undisclosed "deal" in connection with this offense.  Nevertheless, it does bear
28   on the overall credibility of the prosecution's case.

56

that, "if a witness's false testimony is corrected by the prosecution, his 'willingness to lie under oath' is exposed and his credibility is irreparably damaged."). Thus, there is definitely a reasonable likelihood that these Napue errors could have changed the jury's ultimate decision. See also Jackson, 513 F.3d at 1076 (noting that each additional Napue violation "further undermines our confidence in the jury's decision").

Finally, even though these Napue errors more than suffice as grounds for habeas relief, the Court must next consider the Napue errors and the Massiah violation together with the Brady violation based on the prosecution's failure to provide the correct identity and address of the second eyewitness. Under Brady, evidence is material where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler, 527 U.S. at 280 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985); see also Wood v. Bartholomew, 516 U.S. 1, 5 (1995). "A 'reasonable probability' of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434 (quoting Bagley, 473 U.S. at 678). Thus, a "reasonable probability" does not require finding that the suppressed evidence would have led to the petitioner's acquittal. Kyles, 514 U.S. at 434;  see also Jackson, 513 F.3d at 1071 (stating that a "reasonable probability" may be found "even where the remaining evidence would have been sufficient to convict [the petitioner].") (citing Strickler, 527 U.S. at 290). By failing to provide the correct identity and address of the second eyewitness as it was constitutionally required, the prosecution permanently prevented Petitioner from discovering what McKay saw on the night of the murder. In view of the paramount importance of eyewitness testimony in this case, this additional error by the prosecution further and significantly undermined the integrity of the outcome of Petitioner's case.

In conclusion, given the magnitude of the prosecution's combined substantial errors in this case, this Court cannot agree that Petitioner's verdict was one "worthy of confidence." Jackson, 513 F.3d at 1076 (citing Kyles, 514 U.S. at 434) (holding that at both stages of evaluating Napue and Brady errors, "we must ask whether the defendant 'received

57

. . . a trial resulting in a verdict worthy of confidence.'"); see also Commonwealth of The Northern Mariana Islands v. Mendiola, 976 F.2d 475, 486 (9th Cir. 1992) (citations omitted), overruled on other grounds by George v. Camacho, 119 F.3d 1393 (9th Cir. 1997) (en banc) ("The prosecuting attorney represents a sovereign whose obligation is to govern impartially and whose interest in a particular case is not necessarily to win, but to do justice.").

Accordingly, Petitioner is entitled to habeas relief as to the allegations set forth in Claims 1(E), 6(B), and 11(E) regarding Lewis's false testimony regarding the identity of the driver of the car, and the allegations in Claim 5(C) as to the testimony presented at the pre-trial Massiah hearing regarding Cox's testimony.

## CONCLUSION

For the foregoing reasons, the Court hereby finds that the FAP is GRANTED and Petitioner is entitled to habeas relief on the following claims: (1) the Napue allegations in Claim 5(C) as to the false testimony presented at the pre-trial Massiah hearing regarding Cox's testimony; and (2) the Napue allegations in Claims 1(E), 6(B), and 11(E), as to Lewis's false testimony regarding the identity of the driver of the car. The judgment of conviction and sentence of death in the matter of People v. Barry Glenn Williams, Case No. A623377, in the California Superior Court for the County of Los Angeles shall be VACATED.

1

2     The Court denies as without merit the other claims upon which the Court granted an

3     evidentiary hearing in the December 10, 2013 Order, and dismisses as moot all remaining

      claims in the FAP.

4          IT IS SO ORDERED.

5

6     Dated:    March 29, 2016

7

8                                                 _David O. Carter_____

9                                                    DAVID O. CARTER
                                                  United States District Judge

10    cc California Attorney General's Office -docketinglaawt@doj.ca.gov
         Federal Public Defender - Hilary_Potashner@fd.org
11       Ninth Circuit Court of Appeals - Cathy_Catterson@ca9.uscourts.gov
         California Department of Corrections - brandy.ebert@cdcr.ca.gov
12       California State Public Defender - helft@ospd.ca.gov

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28